No. 9.—ELIJAH BIRD, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant.

[1.] The grand jury which found the bill, and the traverse-jury put upon the prisoner at the trial, were summoned without a writ of *venire facias:* *Held,* that the omission is not ground either to arrest the judgment or for a new trial.

[2.] On the first day of the Term, there being seven cases of murder on the Docket, the presiding Judge ordered the Sheriff to summon a number of citizens to attend to serve as talesmen, who attending, were selected and brought in at the trial as talesmen, to complete the panel: *Held,* that this is no ground for a new trial.

[3.] The State, on a trial for murder, proved the killing, and the attending circumstances and closed. The prisoner then proved facts and circumstances, going to rebut the presumption of malice: *Held,* that it was then competent for the State to prove in sur-rebuttal, express malice.

[4.] If evidence of a given fact be withheld from the jury illegally, yet the cause will not be remanded for a new trial, if it is perfectly clear that the proof of the fact could not affect the verdict.

Indictment for murder, in DeKalb Superior Court. Tried before Judge HILL, April Term, 1853.

This cause came up on exceptions to the decision of the Court on a motion for a new trial. The defendant having been

tried and convicted of the offence of murder, moved for a new trial on the following grounds:

1st. Because no *venire facias* had been issued to the Sheriff to summon the grand jury who found the bill, or the regular panel of the petit jury who tried it. It appeared by evidence, that the grand and petit jury lists had been drawn and recorded, and a copy thereof given to the Sheriff, who had summoned them without a *venire;* and this fact was not known to the prisoner until after the trial.

2nd. Because the presiding Judge, observing that there were seven cases of murder on the docket, had, on the first day of the term, and before this case was called, directed the Sheriff to send out into the county, and summon citizens to be in attendance at the Court. They were not required to attend for any particular case, but generally to attend the Court.

3d. Because, when the prisoner was put upon his trial, and the regular panel was exhausted, without obtaining a jury, a list of those whom the Sheriff had summoned as above stated, was handed to the prisoner as a list of the tales jurors. Upon objection being made by the prisoner, that they had not been legally summoned, they were ordered by the Court to stand aside, and the Sheriff was directed to summon a panel of tales-jurors; when twenty of the former list were again summoned by the Sheriff and put upon the prisoner—he objecting to them.

4th. Because when, during the investigation of the case, the prisoner, in his defence, had offered evidence of former amity between him and the deceased, and of provocation on the part of the deceased, the Court permitted the State to introduce, in rebuttal, evidence of malice on the part of prisoner.

5th. Because, when the prisoner had introduced testimony to show that deceased had cut a certain wagon with an axe, (which was the origin of the quarrel resulting in the homicide) and the State, in rebuttal, had proven by a witness that he had afterwards examined the wagon, and found no marks of injury; and the prisoner offered other testimony to prove that deceased had cut the wagon; the Court refused to permit it.

The motion for a new trial was overruled by the Court—which decision. is assigned as error.

EZZARD & COLQUITT, for plaintiff in error.

TIDWELL, Sol. General, for defendant.

*By the Court.*—NISBET, J. delivering the opinion.

[1.] The grand jury that found the indictment; and the petit jury which was put upon the prisoner at the trial, were summoned by the Sheriff and returned without a *venire.* The question is, whether the want of the *venire* is ground for an arrest of the judgment, or for a new trial, motions for both having been made before the Court below and refused. *At C. Law* the jury is summoned by a *venire,* and the Sheriff makes return of the writ, with his action under it. (1 *Chitty's Crim. Law,* 505 to 509.) Our Statute of 1799 has affirmed the C. Law, and requires the writ and a return thereon. (*Cobb's N. D.,* 547, 548.) Our opinion, notwithstanding is, that the want of the *venire* is not such a defect as will vitiate the verdict and arrest the judgment—the trial in other respects, being according to law.

If growing out of the want of a *venire,* or coupled with that defect, there is any thing going to show that the prisoner has not been tried by an impartial jury *boni et legales homines,* it would be a ground for a new trial. We are aware that in this opinion we are in conflict with American authority. (*The People vs. McKay,* 18 *John R.,* 212. *The State vs. Dozier,* 2 *Spear,* 211. 1 *Richardson,* 188.)

These cases are not obligatory; they advise, but do not command: and as to the usage at C. Law, of placing a *venire* in the hands of the Sheriff, we find that there is sufficient in our statutes to authorize a departure from that. Judge *Spencer,* whilst arresting a judgment in the *People vs. McKay,* because there was a seal wanting to the *venire,* and therefore no *venire,* concludes his opinion, as if reluctant to yield common sense to

a bare technicality, by saying, "we do not feel ourselves authorized to dispense with a process required by the Common Law, and also by the Statute, *although we may not see much use in continuing it.*"

And the two cases from *South Carolina* are weakened in their authority by a conflict between them and the principles enunciated by the same Court, in The *State vs. Massey*, and The *State vs. Baldwin*, 2 *Hill R.*, 379.

In these cases motions were made for new trials, and in arrest, on the grounds that the jury list had not been made from the Tax returns according to the act of 1799, and that several of the panel were not free-holders, entitled to vote according to the Constitution of South Carolina, as it was in 1799. These grounds were overruled by the Court of Appeals, because not taken before the Circuit Court, yet the Court proceed to give their opinion upon them. It is true that no question is mooted directly in regard to the necessity of a *venire*, but *Mr. J. O'Neal*, and through him, the whole Court, holds that the requirements of the Statute as to the mode in which the juries are made up, and as to their qualifications, are purely directory to public officers in the discharge of their duty; and if they fail to discharge it, it does not vitiate the array—nor is it any objection to the polls. The act, he further says, was not intended to secure any right, benefit or privilege to the defendant, but was merely to regulate the drawing of the jury in such way as to divide the duty of serving on the jury among the inhabitants of a district—and that he is not prejudiced, if the jury for his trial, are from the vicinage, (the district where the offence was committed) and have all the other legal qualifications. I do not see why the reasoning of this learned Judge does not apply with equal force to the requirement of the Statute, that a *venire* shall issue to summon the jury. Is that not also directory to public officers in the discharge of their duty? Was that intended to secure any right, benefit or privilege to the defendant; and can he complain, if the jury which tries him is from the vicinage, and has the legal qualifications; that they were not empannelled through the formality of a writ? There

are other cases in the American books on both sides of the question—I do not think it necessary to notice them. Our judgment is founded on our own Statutes. From these, we think it clearly demonstrated, that the right of the defendant to an impartial trial by jury, is as fully protected here, without the *venire*, as it is in England with it; and that the writ adds nothing here, to the security of that right. If these things be so, then this defendant has no right to complain. His complaint is not founded upon abuse, conception, partiality, or any thing of that sort; but upon the fact that a legal right, to wit : the right to have the grand and traverse jury summoned by writ of *venire facias* has been denied to him. He is entitled to stand upon all his legal rights; and most willing are we, in a case involving life, to seize upon any right which the laws give, to rescue even him, too clearly a murderer, from the doom which we are satisfied he merits. We have, however, made up our minds, after great consideration, that the empanneling of the juries after a summons without a *venire*, is not in Georgia, the violation of a legal right.

In *England*, those who are to serve on the *grand and petit juries*, are ascertained by Law as a class—that is to say, the qualifications of jurors are determined by Law. When a jury is to be convened, the process of *venire facias* is awarded on the roll, which is a precept directed to the Sheriff, commanding him to cause to come a certain number of subjects, who are by Law entitled to serve as jurors. To compel attendance, upon awarding the *venire* in the *Common Pleas*, there issues the *Habeas Corpora* and *Distringas Juratores ;* but in the *King's Bench* and *Exchequer* after the *venire*, they proceed upon the *distringas* alone. The names of the jurors are not given in the writ. No authority nominates to him the individuals to be summoned and returned. He is left to fill out the list himself from that body, from which jurors are, for the term, to be taken. The duty of summoning the jurors is one of some discretion, and great responsibility; therefore, and hence, too, the necessity of a return of the process. When executed, he returns the process with his actings thereon—that return embraces the

names of the jury summoned, and identifies the jury summoned with the jury which is empannelcd, either as a *grand* or *petit jury*. (3 *Bac. Abr. title Juries.*)   It is obvious enough, from these considerations, that it would be impossible to dispense with the *venire* and the return in *England*, without disordering the *Judicial machinery*, and endangering the purity of trial by jury.   But how is it in Georgia ?   Here the whole matter is arranged and concluded by Law, and the Sheriff is merely a ministerial officer.   The Law, through the action of Judicial functionaries, determines the individuals who at each term of the Court are to constitute the *grand* and *petit juries.*   By the act of 1805, the *Justices* of the *Inferior Court* of the several counties, together with the Sheriff and Clerk, biennially, in the month of June, select from the books of the Receiver of Tax Returns, "fit and proper persons to serve as Grand Ju- rors".   And if the selection is not made at that time, they are required to make it at or before the next Superior Court for the county, to be held thereafter.   This is called revising the Grand Jury list, and this selection defines and fixes the body of citizens who are to constitute the Grand Jurors for the en- suing two years.   With the *Justices of the Inferior Court* is deposited the power of determining who of tax paying citizens are "fit and proper persons" to serve as *Grand Jurors.*   A highly responsible trust it is, and not unfrequently, in some counties, exercised without proper regard to the fitness of the persons selected ; or with too decided reference to the party politics of the county.   But in no instance, within my knowl- edge, exercised with reference to any sinister influence upon the criminal administration of the Laws.   A list of the persons so selected, they are required to transmit, under their hand and seal, to the next *Superior Court* of the county.   The *Clerk* of the *Superior Court*, immediately upon receipt of this list, is required to enter the same fairly in a book provided for that purpose.   And *here we have the record of the whole body of cit- izens who are to constitute the Grand Juries of the County.*— The *Judge* of the *Superior Court*, at the Term to which the list is thus transmitted, causes tickets to be made out with the

names of the selected persons endorsed thereon, and placed in a box provided for the purpose, with two apartments, marked Nos. 1 and 2. This box is then locked and sealed by the Judge, and left in the care of the Clerk, and the key with the Sheriff, not to be opened by any one, on any pretence whatever, except as provided for by Law. From the Jury-box, thus carefully constituted and secured, the *Grand Jury* for each term is taken in this wise—the *Judge* of the *Superior Court*, in open Court, breaks the seal and unlocks the box, and causes to be drawn out of the apartment marked No. 1, not less than 23, nor more than 36 names, "an account of which" is taken by the Clerk—that is, *a record of the drawn Jurors is made by the Clerk at the time of drawing.* The names drawn, are then deposited in apartment No. 2. When in the drawing, apartment No. 1 is exhausted, it proceeds out of No. 2; and the names taken from No. 2 are returned at once, to No. 1, and so on alternately. By the act of 1815, if on any account, the *Judge* of the *Superior Court* shall fail to draw the *Grand and Petit Juries* the *Justices* of the *Inferior Court*, together with the Sheriff and Clerk, are required, in like manner, to draw them for the next term, at least 60 days before the commencement of the term. The *Petit Jury* box is constituted and secured, and the Juries drawn in, substantially, the same way.— The *Grand* and *Petit Jury* lists, thus drawn, are each annexed to a *precept* by the Clerk, and the precepts, with the lists, are by him handed to the Sheriff or his deputy, within three days from the drawing ; which precepts he is required to execute by summoning the persons named in the respective lists, ten days before the sitting of the Court for which they are drawn, and by returning them into Court ; in which return he is required to set forth the names of the persons summoned—the time when they were summoned, and the names of those not summoned, with the reasons why they were not summoned.— (*Cobb's N. D.*, 549, 550, 552, 547, 548.)

By this recital, it is apparent how carefully the Laws of Georgia guard the selection, summons, and empanneling, of both grand and petit juries. And it is to be noticed, that

whilst a *precept* issues to the Sheriff to summon them, yet he has no discretion whatever as to the persons—they are ascertained by law, through the action of the *Justices of the Inferior Court* in selecting the body of citizens who are to serve as jurors, either Grand or Petit; and of the *Judge* of the *Superior Court* in drawing them for each term. A record is kept of the whole body as selected, and a record is kept of each Jury drawn for the service of each term. A list of those drawn taken from the record, is handed to the Sheriff—those and those only can he summon. Again, when served and returned, a record is again made of the names of the jurors summoned.— So that the record of the drawn list is a check upon the record of the summoned list. They must be identical. From the list returned, which is one and the same with the list drawn, the panels are made up. Now in the case before me, every requirement of the law was fulfilled, except handing to the Sheriff, with the lists of the drawn jurors, a precept, or writ of *venire*.

The juries were regularly drawn, and as drawn recorded.— A list of each jury so drawn and recorded, was handed to the Sheriff; he summoned the jurors named in the lists, and made return thereof; the *Indictment* was found by the *Grand Jury* thus drawn, summoned and returned; and the Panel of the *Traverse-jury* which was put upon the Prisoner, is the list of Petit Jurors drawn, recorded and returned. Is it not clear that every requirement of our Statute, as to the manner in which trial by jury is regulated, so far as the rights of the Prisoner are concerned, was complied with? Was he in any conceivable degree prejudiced by the omission of the precept? If he was not, no legal right was violated. In this case, with the *venire*, no right or privilege could have been afforded to him, which he did not in fact enjoy. With such securities as our Statutes provide for empanneling juries; greater, far greater than those provided by the C. Law; and all responded to on this trial; with no allegation of bias, prejudice or corruption, it would be a sin against common sense, and a childish adhesion to technicality; reproachful to the Judicature of the State, to

arrest the judgment, or remand the case for a re-hearing. At the same time, we do not rule that the *venire* ought to be dispensed with; the Statute requires it, and it is therefore important to the rights of other persons. A juror, for example, would not be in contempt for non-attendance, if not summoned under it. Nor would the Sheriff be guilty of a breach of duty, if he declined to summon the juries without it. We meet this question on a motion for a new trial and in arrest, upon a statement verified, that the defendant did not know of the defect, until after the trial. But for this statement, it is by no means clear that if we believed the exception good, we could entertain the motion. The record does not disclose the want of a *venire*. The party plead to the merits. Other Courts who have held the *venire* indispensable, have held the defendant bound to plead it in abatement. (*Prince* 660, 9 *Geo.* 58, 4 *Dev.* 305, 6 *Blackf.* 248, 4 *Ibid* 72, 5 *Port.* 474, 7 *Port* 526.)

[2.] There being seven capital cases on the Docket at this Term of the Court, in view of that fact, on the first day of the Term, Judge *Hill* directed the Sheriff to send out into the county, and summon a large number of citizens to be in attendance upon the Court. This act is assigned for error. In the argument, it was denounced as being without warrant in any law of the land, or usage of the Courts; as being unjust to the prisoner, and as evincing an overweening zeal on the part of the Court, to convict. The connection which this cause has with this act of the Court, is simply this, that when the jury came to be made up, *talesmen* were taken from those citizens thus brought within call of the Court. We see in this act no violation of Law; no anxiety to convict; and no injustice to the defendant: but on the contrary, it was the exercise of a power never before questioned; not calculated to prejudice the prisoner's case, but eminently calculated to ensure an impartial jury; and was a commendable forecasting provision, for expediting the business of the Court. An act which is entitled to receive, and does receive the unqualified approval of this Court. It was an *expedient* act in reference to the business of the Court. With a large docket of civil cases, and seven cases for

murder before him, and the time allowed for holding the Court limited; lying under an obligation to dispose of the whole dock-et if possible, and more especially to deliver the jail; it was the duty of the Court to provide for the exigencies of the Term, and so to arrange the business of the Court as to fulfil that ob-ligation. He had a right to believe that each capital case would require a full panel of jurors; and that to procure them after the cases respectively were called, would require a great deal of time, and would greatly hinder and retard the business of the Court. It was expedient to avoid this, by ordering into the Court-yard, a number of citizens sufficient for the purposes of the Criminal Docket.

*It was authorized by Law.* The power to arrange the order and to provide for the probable necessities of the business of the Court, is incident to all Courts. Summoning these citizens was not an order to bring in *talesmen* for any particular case; it was an order to bring them within convenient reach of the Court, when it might become necessary to order *talesmen*. The order was general to summon them to attend, in consequence of the number of capital cases on the docket. Indeed, the Sheriff was instructed not to summon them for any particular case; the command was to summon citizens to attend upon the busi-ness of the Court. It was argued that this procedure was in violation of law, because it was an order for *talesmen* in advance of the calling of the cause; the counsel insisting, that by our Statute, the *talesmen* must be taken from by-standers upon an order to be granted, *only* when from challenges or otherwise there shall not be a sufficient number of jurors to determine the case. I have already suggested that this was not an order for *tales-*. *men*, but only a provision for talesmen, when at the proper time they should be called for. Our act of 1799 provides, that "when from challenge, or otherwise, there shall not be a suffi-cient number of jurors to determine any civil or criminal cause, the Court may order the Sheriff, or his deputy, to summon by-standers, *or others*, qualified as hereinbefore required for the trial of such cause or causes sufficient to complete the panel." (*Cobb's D.,* 548.) At C. Law *tales jurors* were taken from the

*by-standers*—not so here. They are taken from by-standers or *others*. By our act, *others* may be summoned upon order of the Court. The Court may, if needs be, send out to the remote limits of the county for them. That is just what he did in this case, and as we think, by authority of the Act of 1799. The citizens were brought in, and when the case was called, and it became apparent that from the original panel there was not suffi-cient number of jurymen to determine the cause, then, and not until then, was the Sheriff directed to make up a full panel.— Then it was that the panel was arrayed, from which the Jury was selected, which tried the plaintiff in error.

The course taken by the Court, was *calculated to secure an impartial jury*. Better, far better, that the citizen shall be tried by a jury selected from men brought from their homes— honest, uncommitted, unbought, and unmerchantable men, than by the professional, loafing jurymen who hang about some of our Court-houses—material, to be used, if ever it should happen that prosecutors, or prosecuting officers; or defendants, or de-fendants' counsel; or Sheriffs, are to be found so forgetful of every honorable obligation, as to bring them into the jury-box. It concerns the purity of the Criminal Administration, that the Judges of the Superior Courts be sustained in just such a course as that taken by Judge *Hill* in this cause.

A list of the persons summoned as above stated, was handed to the prisoner when put upon trial, as a list of *tales jurors* to complete the panel; and objection being made that they had not been legally summoned, it was withdrawn; and the persons named therein were directed to stand aside. The Sheriff was then directed to bring in *talesmen*, and twenty of those persons were summoned, and put upon the prisoner. It is objected that these twenty were illegal jurors. What has been already said, disposes of this objection. One ground of objection to them, however, taken by counsel, merits notice. Assuming that the list presented to the prisoner was the tales put upon him, and that upon objection made, were by the Court held disqualified; they say that no one of that list can be afterwards sworn on

the jury; and if sworn, it is ground for new trial.    (1 *Chitty's Crim. Law*, 423.)

Without controverting the legal proposition, we think that it has no application to the facts of this case.    The list of names handed to the prisoner, as the summoned tales list, was not adjudged disqualified.    The Court made no decision upon the objection stated by the prisoner.    Upon its being made, the prosecutor withdrew the list; and thereupon the Court directed the persons to stand aside, and the summoning and arranging of the panel then proceeded, and the talesmen were brought in from the by-standers; some of them brought there by the previous order of the Court—which order we have already ruled legal.    These twenty, therefore, did not occupy the position of jurors challenged and held disqualified.    If, indeed, the Court had held as he did not hold, that the objection was valid, to wit: that the bringing of these men there under the order of the first day of the term disqualified them as tales jurors, we would overrule that decision.

[3]. The State relied upon the facts first proven, as making out a clear case of murder—the malice ingredient being implied, as it clearly was reasonably to be implied, from all the circumstances of the killing.    The prisoner then put in evidence facts which went to some extent in rebutting the presumption of malice.    The State then asked leave to strengthen its case, by proving *express* malice; and it being granted, the prisoner excepted.    Upon what ground, I confess my inability to see.— Surely it is not necessary to discuss this point.

[4.] We are also satisfied that the evidence of the prisoner to prove that the wagon was in fact cut by the deceased, ought to have been admitted.    It was an error to exclude it, but we cannot send the cause back on that account, because, having read the whole of the testimony most carefully (amounting to about one hundred manuscript pages) we are perfectly sure, that if the fact had been proven by fifty witnesses, it could not have varied the verdict; and that with that fact in evidence, it would be still as clear a case of murder as any which it has fallen to the lot of this Court to review.

Let the Judgment be affirmed.