## WHITE v. THE STATE.

1. Upon the evidence contained in the record, the trial judge did not abuse his discretion in refusing to grant a change of venue.
2. A declaration made by one in extremis, who is conscious of his condition, to the effect that a person afterwards indicted for his homicide had "shot him down like a dog," is a statement of a fact, and not the mere expression of an opinion by the person making the declaration, and is admissible in evidence as a dying declaration.
3. When, on the trial of a person indicted for a homicide, it becomes a material inquiry as to whether a person slain had fired his pistol in the progress of a rencounter which resulted in his death, it is competent to prove by a witness who spoke from her own knowledge, that the deceased was accustomed to carry the hammer of his pistol on an empty cartridge; such evidence is admissible to establish a habit of the deceased, not as direct evidence of the fact in issue, but as a persuasive and legitimate supporting circumstance to be considered by the jury in determining whether the pistol found in that condition had in fact been fired.
4. It is within the discretion of the trial judge, after the accused has concluded the introduction of his evidence, to permit the solicitor-general to introduce further testimony, either in rebuttal of the evidence offered by the accused, or in corroboration or confirmation of witnesses introduced on behalf of the State.
5. The alleged newly discovered evidence, being such as on another trial ought not to change the result, does not require the grant of a new trial.
6. The verdict was amply supported by the evidence, and there was no error in refusing a new trial.

　　　Argued March 15,—Decided March 29, 1897.

Indictment for murder. Before Judge Butt. Muscogee superior court. November term, 1896.

*C. J. Thornton, G. E. Thomas* and *A. E. Thornton,* for plaintiff in error.

*J. M. Terrell, attorney-general, S. P. Gilbert, solicitor-general,* and *J. H. Worrill,* contra.

ATKINSON, Justice.

Henry White was indicted in Muscogee superior court for the offense of murder, the indictment alleging the homicide of William Jackson by him on the 14th day of October, 1896. On the 18th day of November thereafter the case came on for trial, and the defendant moved the court to grant a change of venue, upon the ground that in consequence of the strong local prejudice existing in the county of Muscogee against him, he could not obtain a fair trial in that county. Upon the hearing of this motion a number of witnesses were sworn, and in addition to their testimony much documentary evidence, consisting of extracts from the daily papers in the city of Columbus immediately following the homicide, were introduced in evidence. The testimony shows, that at the time of the homicide there was intense feeling in the city of Columbus against the accused; but even the witnesses who swore in his behalf testified that the public mind had undergone a change, that this excitement had to a great extent abated, and that in their opinion the accused could be fairly and properly tried in the county of Muscogee. The trial judge overruled the motion for a change of venue, proceeded with the trial, and empanelled the jury without exhausting the list of names of persons in the jury-box who were subject to jury duty.

Upon the trial it was shown that because of some difficulty in which J. A. White, the father of the accused, became engaged in the morning, both he and the accused were summoned by certain members of the police force to appear in the recorder's court. Upon this provocation, and none other, so far as the record discloses, both J. A. White and the accused became very much enraged and incensed against the police force of the city of Columbus. They

proceeded to arm themselves, the father with a rifle, and the accused with a pistol, and after purchasing ammunition with which to load their weapons, they went down to a barroom upon one of the principal streets in the city. They there discussed, in the presence of others, the fact that they expected to have some serious difficulty, and expressed great indignation against the members of the police force generally, and against the deceased in particular. As they left this saloon and came upon the sidewalk, they met two policemen, and instantly, without further provocation or warning, the father presented his rifle and shot down one of them. The other policeman, who was the person for whose murder the accused was indicted, retreated down the street, took refuge behind the corner of the barroom, himself standing in another street. The accused returned to the barroom and ran to the side entrance thereto, reached the street in which the policeman had taken refuge, and from the rear fired a pistol shot striking him. The deceased ran around the corner, and there encountered J. A. White, who also shot him. The accused and his father then moved over to the middle of the street, and the son, observing that Jackson, the deceased, had not expired, called the attention of his father to that fact, who turned and immediately fired upon him as he lay prostrate upon the ground, inflicting upon him another wound. Both father and son then fled, and in the effort to apprehend the former, he was slain. The latter took refuge in the State of Alabama, but was subsequently apprehended and brought back for trial. Jackson, the deceased, made a dying declaration, in which he stated that the accused had "shot him down like a dog," repeating that expression. It appeared that when the deceased was removed from the place where he had fallen, he had a pistol in his possession, the hammer resting upon an empty cartridge. There was some evidence that, during the progress of the difficulty, the deceased had fired his pistol. Upon this question there was a conflict in the

evidence.  Upon the trial of the accused, the wife of the
deceased was permitted to testify (over the objection of the
accused that such testimony was irrelevant and hearsay),
that she had seen the pistol of the accused on the day of the
homicide, and that at that time the pistol was in the same
condition as when it was found after the killing; that it was
the custom of the deceased so to carry his pistol, and he
had oiled the pistol that morning, and spoke of it.

The accused was convicted, and moved for a new trial,
(1) upon the general grounds, that the verdict was contrary to law, contrary to evidence, and without evidence
to support it.   (2) Upon the further ground that the court,
over objection of the accused, permitted Means Brannon,
a witness for the State, to testify as follows: "I saw Mr.
Will Jackson the day he was shot; I saw him at the Vernon
Hotel in Columbus, Ga.   He said he did not expect to get
well; he called me over to the bed and said, 'Mr. Brannon,
that young boy shot me down like a dog, shot me down like
a dog,' repeating it.   He [Jackson] did not say whether he
shot or not."   The objection was, that this was the opinion,
statement, conclusion and declaration of Jackson; and that,
in order for a dying declaration to go to the jury, it should
be a statement of a fact which is a part of the res gestæ.
(3) Further, because the wife of William Jackson, as a
witness, was permitted to testify (over the objection that
the same was hearsay and illegal, and did not show the
condition of the pistol at the time of the homicide), that
she identified the pistol as that of the deceased; that she
last saw it on the morning before he was shot in the evening, he having then put it into his pocket by her bedside
where she lay in bed sick; that all the chambers were loaded
but one; he always carried it on an empty cartridge; that
he had oiled the pistol that day and put that in, and spoke
of it when he put it in.   (4) Further, because, after the
State had closed its case, and defendant had submitted
testimony, together with his statement, and closed, the

State offered six witnesses who were named. To the testimony of each of said witnesses being admitted, accused objected, on the ground that the testimony of said witnesses nor any one was in rebuttal of anything that he had brought out, or had been brought out, and testimony offered and submitted by him was in rebuttal of the State's testimony. (5) Further, because of newly discovered evidence, first, of Dr. Sims, a witness of high character, who would testify that the deceased Jackson stated to him, soon after he had been shot, that he fired one shot at White. Second, because of the newly discovered testimony of R. B. Coleman, who was likewise shown to be a witness of good character and credibility, who would testify, that he was close to J. A. White (who was the father of the accused, and who took a most prominent part in the shooting), and saw him with his gun raised and aiming as though he was going to shoot; that witness shouted at J. A. White, "Don't shoot him, as you have already killed him"; that said White cut his eye around to see whence came the exclamation, and fired at Jackson; that witness never heard Henry White say anything to his father, J. A. White, in regard to shooting him again; that he saw Henry White standing at the corner of Ramsey's building, and J. A. White was standing on 13th street near the street-car track. Upon the hearing of this motion for new trial, the circuit judge overruled it, and error is assigned upon that ruling.

1. Prior to the passage of the act approved December 17th, 1895, it was necessary that the trial judge should examine all persons in the county where the crime was committed, who were liable to serve on juries, before the venue of a criminal case could be changed to a county other than that wherein the offense was alleged to have been committed. That act institutes a new order of things; and now it is competent for the judge of the superior court, in any criminal case, to change the venue of the trial of such case whenever, in his judgment, an impartial trial cannot be

had in the county where the crime was committed. In or-
der to ascertain whether such trial can be there had, it is
competent for him to hear the testimony of witnesses, oral
or upon affidavit, and as well to hear any other evidence
which may be competent and relevant. The law leaves this
matter largely, we might say almost entirely, in the discre-
tion of the trial judge. It imposes upon him the respon-
sibility of making this examination; and this court has no
power to control his discretion with respect to such matters,
unless it has been plainly and manifestly abused. We
are not prepared to say, from our point of observation, that
the public mind in the county of Muscogee was in such a
state as that the accused could not obtain a fair and impartial
trial. The circuit judge was there, present upon the scene
of the trial. He had the opportunity of observing the
manifestations of the public temper. He heard the wit-
nesses who swore upon that issue, and certainly had a much
better opportunity than the members of this court could
have of determining whether the accused could get a fair
and impartial trial. It is not at all improbable, had some
of the members of this court been presiding upon the trial,
that they would have directed a change of venue. There
was nothing, however, in the evidence which comes to us
in the record, that will warrant us in saying that such
change was absolutely demanded in furtherance of the pub-
lic justice; and therefore, inasmuch as the trial judge, in
the exercise of his discretion, saw proper not to give the
case that direction, this court will not undertake to control
his discretion.

2. The court did not err in admitting the dying declara-
tions, of which complaint is made. According to the pro-
visions of our Penal Code, §1000, "Dying declarations,
made by any person in the article of death, who is con-
scious of his condition, as to the cause of his death and the
person who killed him, are admissible in evidence in a
prosecution for the homicide." The question in this case is

upon the substance of the sayings admitted in evidence. Dying declarations belong to that class of evidence which are admitted from the necessity of the case. They are like confessions, in the respect that they should be received with great care and weighed with caution. They are susceptible of being easily misunderstood, and inferences drawn from them are sometimes exaggerated so as to give them a value in the mind of the jury far beyond their deserts. This circumstance, however, does not go to the competency, but to the credit of dying declarations. In the case of *Wilkerson* v. *The State*, 91 *Ga.* 739, this court having under review section 3781 of the Code of 1882, above quoted, ruled: "In our opinion, the words 'as to the cause of his death' are sufficiently broad to include all relevant facts embraced in the res gestæ of the homicide. The object of the law in permitting such declarations to be received would be defeated if they were confined to the immediate physical cause of the death, and the name of the slayer. The conversation or conduct of the parties at and immediately preceding the homicide, and constituting the res gestæ of the occurrence, such as a witness would be permitted to relate, may, we think, be proved by the dying declarations of the person killed." According to this exposition of the section of the code above referred to, these dying declarations were competent, provided they did not amount to the mere expression of an opinion by the deceased as to the cause and manner of his death. The rule of law is, that a dying declaration to be admissible must consist of a statement of a matter of fact, and a declaration which amounts to the mere expression of an opinion by the person making it should not be received in evidence. In the course of our examination of the authorities upon that subject, we find a well reasoned case cited in the 2d volume of Taylor on Evidence, p. 470, sub-page 16, in which the doctrine is stated as follows: "The declarant should state facts rather than conclusions." McBride *v.* People, 5 Colo. App. 91

(1894). "Where a declarant, however, used the expression,. 'He shot me down like a dog' [which is the identical expression complained of], the expression was held admissible. Declarations of a party in extremis, in order to be admissible, must be as to facts and not conclusions. They are permitted as to those things to which the deceased would have been competent to testify, if sworn in the case. But I do not think the expression of the deceased a conclusion. It was given as a part of his narrative relating to the affair, and I think it was merely intended to illustrate the lack of provocation and the wantonness in which the appellant did the act. It was descriptive of the manner in which the act was committed. It conveyed the idea that the appellant disregarded the claims of humanity, and, without giving him any warning, shot him. It was the statement of a fact made by way of illustration." State *v.* Saunders, 14 Ore. 300 (1886). So a declaration, "It was done without any provocation on his part." Wroe *v.* State, 20 O. St. 460 (1870). Or that deceased was "butchered." State *v.* Gile,. 8 Wash. 12 (1894). In the case of *Darby* v. *The State,* 79 *Ga.* 63, the dying declaration made by the deceased,. that the defendant had cut him, and that he had done nothing to cause it, was objected to for the same reason as. that urged in the present case against the admission of the declaration now under review; and it was held that the objection to its admission upon the ground that it stated a conclusion rather than a fact, was properly overruled. According to the individual opinion of the writer, the rule authorizing the admission in evidence of dying declarations. has already been extended to the point beyond which courts. cannot safely go, without exposing persons accused of homicide to the danger of suffering serious injustice; but according to the decisions of our own court, and the uniform current of judicial opinion which prevails elsewhere, we all agree that no error was committed in overruling the objection made by the accused in the present case to the introduction of the declaration which we have just considered..

3. There was no error in the admission of the testimony of the wife of the deceased, to which objection was made at the trial. In the course of the trial, it became a pertinent inquiry as to whether the deceased had fired his pistol during the rencounter which resulted in his death. At the time it was taken from his person after the homicide, it was found to be a revolver with one chamber empty, the hammer resting upon a cartridge which had been discharged; whether recently or not does not appear. The contention of the State was that the pistol had not been discharged, but that it was in the same condition as it was before the rencounter. In support of that contention, the wife testified, that she had examined the pistol on the morning of the same day upon which the homicide occurred; that at that time it was in the same condition as when it was taken from the person of the deceased. She testified as a matter of fact that the deceased always carried his pistol in that condition. If we take this statement as literally true, there could be no possible objection to its allowance; but we are inclined to think that when she spoke in those terms, she referred rather to the individual custom and habit of the deceased so to carry his pistol than to her own knowledge of the manner in which he uniformly carried it, and we are quite satisfied that even under that view of her testimony, it was competent. She testified as to the exact condition of the pistol on the morning before the rencounter. The question at issue then was whether it was in the same condition at the time it was recovered from the body of the deceased. As bearing upon the probabilities of that issue, such testimony, while of slight importance, was nevertheless competent. The habit and custom of the deceased was neither provable nor relied upon as an independent fact, but simply as a circumstance supporting the inference that the pistol remained in the same condition as when it was last seen by the witness. There are many cases in which the habits and customs of individuals have

been permitted to be proved in support of theories involving the conduct of such individuals, many of which instances are cited by Mr. Lawson in his treatise upon the Law of Usages and Customs. In a note upon page 78, referring to the customs of particular persons or the habits of individuals, he says: "If the memory of a witness is defective concerning an act which it is of importance to prove as having occurred at a particular time, or under certain circumstances, it would seem that his custom to do that act at the time or under the circumstances alleged should be of weight in raising an inference that the act was then performed, and evidence of the habit ought therefore to be allowed. In the progress of a trial, for example, it is desired to prove that A., at eleven o'clock on the night of January 1, 1880, was in bed. A. cannot swear positively that he was in bed at that hour on that particular night; but A. is a man of correct and methodical habits, and he is willing to swear that it has been his universal custom, to which he cannot recollect an exception, to retire at ten p. m. It is obvious that this would tend to satisfy the ordinary mind that A. was in bed at the hour named. Therefore it is apprehended that such testimony would not be rejected by the courts; it has been spoken of in one case as persuasive and legitimate supporting evidence." Applying the same rule to another witness, let us suppose that A. was dead, and it became necessary to prove the same fact concerning him, that at 11 o'clock on the night of January 1st, 1880, he was in bed, and Mrs. A. were called as a witness, her testimony to the same effect, while not conclusive upon that point, would be strongly corroborative, and certainly receivable as being persuasive at least. If Jackson had been in life and sworn as a witness, and being unable to remember the condition of his pistol at a given time, it would certainly be competent for him to express an opinion as to its condition, referring that opinion to the universal

and unbroken custom and habit of his life. We are not undertaking to deal with the degree of credit which should be attached to that class of evidence. It would seem to be slight of itself, and entitled to little weight, but it is never-theless competent, and may be properly considered by the jury in connection with all the other testimony which bore upon the question as to whether the deceased had in fact discharged his pistol during the progress of the rencounter.

4. To the proposition announced in the 4th head-note supra, to the effect that it is within the discretion of the trial judge, after the accused has concluded the introduc-tion of his evidence, to permit the solicitor-general to in-troduce further testimony, either in rebuttal of the evi-dence offered by the accused, or in corroboration or con-firmation of witnesses introduced on behalf of the State, it is only necessary to refer to the case of *Bird* v. *The State*, 14 *Ga.* 43, where it was held: "The State, on a trial for murder, proved the killing and the attending circum-stances, and closed. The prisoner then proved facts and circumstances going to rebut the presumption of malice: *Held*, that it was then competent for the State to prove, in surrebuttal, express malice." And also the case of *Walker* v. *Walker*, reported on page 242 of the same vol-ume, in which this court uses the following expression: "It should require a very strong case of threatened evil, to justify a court in preventing a party from giving additional confirmatory, cumulative and corroborative evidence, either of facts previously proved, or which tends to strengthen, add force or probability to such evidence." A number of other cases in our own reports hold directly to the same effect, and this is in harmony with the rule which prevails elsewhere. See Thompson on Trials, §348. According to that authority, the matter of reopening a case to admit additional evidence, whether the case be civil or criminal, is always within the discretion of the trial judge, and affords no ground for the reversal of a judgment denying

.a new trial, unless it shall appear that there was an abuse of discretion. Under the facts of the present case, we are not prepared to say that the trial judge abused his discretion with respect to this matter.

5, 6. In view of the facts and circumstances attendant upon the commission of this homicide, we are fully per-,suaded that the alleged newly discovered evidence would not and ought not to produce a different result. If human testimony is to be believed, the deceased, passing along a public street in the discharge of his public duties, was ·violently set upon by two desperate men and, without the slightest provocation from him, was deliberately and in cold blood shot to death. The evidence demonstrates that he was shot from the rear by one of his assailants when he had sought refuge behind a neighboring building from the violence of another of his assailants. There is not the .slightest circumstance of excuse, justification, extenuation, or even palliation of the guilt of the accused. No jury which had the slightest respect for its oath of office could, upon its conscience, return a verdict of acquittal; and however much we may deplore the unfortunate circum-:stances which have brought this young man to his untimely end, it must be remembered that while the law should be administered in mercy, it should strike with a mailed hand the man who deliberately and in cold blood takes the life of a fellow-creature. The trial judge did not err in refusing a new trial; and the judgment stands

*Affirmed. All the Justices concurring.*