Staunton ·

PIPPEN V. COMMONWEALTH.

September 9, 1915.

1. EVIDENCE — *Dying Declarations — When Admissible — Weight.*—
Dying declarations are admissible in evidence, as an excep-
tion to the hearsay rule, where the death of the declarant is
the subject of inquiry, and the declarant is under a sense of
impending death and without any hope or expectation of re-
covery. When admitted, the weight or credit to which they
are entitled is a question for the jury.

2. EVIDENCE—*Dying Declarations—Opinion Rule Not Applicable.*—
The opinion rule has no application to dying declarations.
The declarant being dead, it is no longer possible to obtain
from him, by questions, any more detailed data than his state-
ment may contain, and hence his inferences are not in this in-
stance superfluous, but are indispensable. A statement by a
dying declarant that the shot inflicting a mortal wound upon
him was not fired accidentally, but that the accused "done it
a-purpose" is admissible on the trial of the assailant for
homicide.

3. EVIDENCE — *Dying Declarations — Resentment — Admissibility —
Weight.*—The exhibition of resentment towards the accused
on the part of the declarant does not of itself render the lat-
ter's dying declaration inadmissible in evidence, but goes to
the weight and value of the same as evidence.

4. APPEAL AND ERROR—*Verdicts—Conflicting Evidence.*—The ver-
dict of the jury founded on conflicting evidence and approved
by the trial court cannot be disturbed on a writ of error from
this court.

Error to a judgment of the Circuit Court of Russell
county.

*Affirmed.*

Plaintiff in error, Charles Pippin, was tried at the February term, 1915, of the Circuit Court of Russell county upon an indictment for the murder of William R. Dorton. The jury found the accused guilty of voluntary manslaughter and ascertained the term of his confinement in the State penitentiary at two years and the court sentenced him accordingly. To that judgment this writ of error was granted.

Two bills of exception were taken at the trial and two grounds of error are assigned here:

I.  The first assignment involves the action of the court in admitting as evidence the dying declarations of the deceased.

II.  The second assignment alleges that the verdict of the jury is contrary to the law and the evidence.

There is a singular lack of conflict in the testimony of the witnesses. The material divergence arises out of the opposing theories of the case, the contention of the Commonwealth, founded on the dying declarations of the deceased, being that the homicide was intentional, while that of the accused, based on his own testimony, is that it was accidental.

A summary of the facts will throw light on the situation and relations of the parties. They are fairly stated in the brief of the attorney-general and his assistant as follows:

"The deceased, W. R. Dorton, known as 'Buck Dorton,' and the plaintiff in error, Charles Pippin, were second cousins and had, up to the date of the tragedy, been good friends. About 5 o'clock on the afternoon of December 27, 1913, Buck Dorton and David Powers, a tenant of the former, met Charles Pippin and Homer Dorton, the nephew of Buck Dorton, and went out to the latter's barn.

where he treated them to one or two drinks of whiskey. After standing around for a few minutes, they went to Homer Dorton's house. There, Buck Dorton proposed that they should have a hot drink, so Homer Dorton brought out a jug of liquor and they had several rounds of hot drinks. In the meanwhile, David Powers' children, Roller Powers, aged thirteen, and Beecher Powers, came for their father. After having several drinks, different members of the party began swapping leggins and watches and finally Charles Pippin proposed a game of crack-a-loo. Buck Dorton and Charles Pippin pitched the game and Dorton won. Later on, Pippin made a proposition to David Powers to pitch a game of crack-a-loo for twenty cents owed by Pippin to Powers. Upon David Powers' refusal to pitch, the proposition was made to allow his son Beecher to pitch with Charles Pippin, but upon demurrer on his part, Buck Dorton proposed to Beecher Powers to pitch for him, giving him twenty-five cents for the purpose. It was agreed that Buck Dorton should call the pitch and that there should be no measurement. Upon Buck Dorton's calling the pitch a tie, Pippin claimed that he was nearer the crack and started to measure, whereupon Buck Dorton said there was to be no measurement. Pippin replied 'Yes,' whereupon Dorton said, 'I don't think so, Charlie,' and Pippin said, 'You are a liar.' Dorton set down his lantern and slapped Pippin over on the bed. After the fracas was quieted down by Homer Dorton and David Powers, the two got into an argument and again Buck Dorton slapped Pippin, grabbed him by the throat and pitched him on the floor, whereupon Pippin said, 'If you were over on the hill you could not do me this way.' Dorton replied, 'Use your little gun.' Pippin answered, 'I aint got none;' whereupon Dorton said, 'I will furnish you a gun, load it and go with you anywhere you want to.' Then Dorton went over to a corner of the room, picked up an old shot-gun which was

there, brought it over to a small table and loaded it, putting in two cartridges. There was only one hammer to the gun, the left being off. He then crossed to where Pippin was and gave him the gun which was taken by Pippin in his hands. Immediately all who were present, except the two principals, left, Powers and his two boys going out of the front or north door of the room and Homer Dorton going through the south or back door of the room into the dining room. As Homer Dorton went through the back door, he heard the noise of a shell dropping on the floor and, turning around, saw Buck Dorton leaning with his right side against the door shutter and Pippin on the front porch with the gun broken and kneeling down, as if searching for something. Homer Dorton continued a little further and the gun was fired. When he went back into the room, Buck Dorton said, 'I am a dying man, that cowardly son-of-a-bitch shot me,' and Pippin said, 'Lord have mercy on me, I have killed Buck Dorton,' and ran crying across the hill, taking the gun with him and dropping it in a field across the road.

"Powers and his boys had gotten about seventy-five yards from the house when the shot was fired. Homer Dorton went after Buck Dorton's wife and met her on her way to the house. As soon as she got into the door she said, 'Will, what on earth is the matter?' Buck Dorton replied, 'I am killed,' and being asked who killed him he replied, 'Charles Pippin.' His wife then said, 'Will, I hate for you to leave me.' He said, 'I hate to leave you, but do the very best you can.' When asked by neighbors whether the shooting was accidental or intentional, he said, 'He done it a-purpose.'

"The load entered Dorton's right side, about six inches below the arm-pit, making a round hole, passing through the liver and right lung, ranging slightly upward. It was

a clear wound and the shot did not scatter. Dorton lived less than three-quarters of an hour."

The witness, B. H. Salyer, testified to the dying declarations as follows:

"A. After I had examined the wound, I saw there was no blood on the outside. I stepped back to Mr. Vermillion and told him he was a dead man; that we could not do anything for him, and then we decided that we would ask him who done it. I went then and asked him who shot him.

"Q. Just state the conversation as it occurred.

"A. I asked him who shot him and he said Charles Pippin, and I asked him if it was accidental or did he do it purposely and he said, 'Done it a-purpose.'

"Q. What did he say about getting well?

"A. I says to him, 'Perhaps you are not hurt as bad as you think you are?' He says, 'Yes, I am a dead man.' About that time we could hear the gurgling of blood on the inside. He turned his head over and says, 'Listen at that, I am a goner.' I says 'Anything you want us to do?' and he says, 'Nothing you can do for me.' He says, 'Get the fellow that shot me if it takes all I have got.' . . .

"A. His wife and perhaps some of the other relations tried to get him to pray, or something like that, get ready to die, and he said, 'No, it was too late.' You know about what conversation would go on in a case like that. . . .

"Q. Did he say he wanted the durned rascal or durned son-of-a-bitch caught?

"A. Perhaps he did say he wanted the rascal caught that shot him—it was a low down, dirty, cowardly trick, or something like that.

"Q. Something of that sort?

"A. Yes.

"Q. Did he use the words durned rascal or durned son-of-a-bitch?

"A. I won't say that he did. I don't believe he did. He said it was a low down, dirty, cowardly trick."

The statement of A. B. Vermillion, in respect to the dying declaration, substantially corroborates the testimony of Salyer.

The accused testified that the shooting was accidental, and occurred as follows: That he "meant to step out of the door, I meant to get the shells out and got one out and it fell on the floor, and Buck reached out and grabbed the gun and jerked it and the gun fired." He represents himself at the time as standing with one foot on the porch floor and the other on the door sill, ten inches higher; that he had the gun "broke down" to remove the shells, when Dorton seized the barrels with his right hand, discharging the gun and inflicting the wound which caused his death.

*Finney & Wilson* and *W. W. Bird,* for the plaintiff in error.

*Jno. Garland Pollard, Attorney-General* and *C. B. Garnett, Assistant Attorney-General,* for the Commonwealth.

WHITTLE, J., after making the foregoing statement, delivered the opinion of the court.

As remarked in the statement of facts, there are but two assignments of error and they will be considered in the order of their statement.

I.   Were the dying declarations of the deceased admissible evidence?

The doctrine of the admissibility of dying declarations as evidence is confined to cases of homicide, where the death of the declarant is the subject of inquiry. It constitutes an exception to the general rule which excludes the

admission of hearsay evidence, and is justified on grounds of public necessity. Such declarations were admissible at common law.

In 1 East's Pleas of the Crown, p. 153, it is said: "Evidence of this sort is admissible on the fullest necessity; for it happens that there is no third person to be an eye-witness of the fact, and the usual witness in occasions of other felonies, namely, the party injured himself, is gotten rid of."

In a note to 1 Greenleaf on Evidence (14 ed.) sec. 156, it is stated that *Rex* v. *Reason*, 1 Strange 499 (14 How. St. Tr. 1), decided in 1722, is the earliest reported English case on the subject. As is now well known, the doctrine is engrafted on the jurisprudence of the United States and of all the States of the Union.

In *Bull's Case*, 14 Gratt. (55 Va.), 620, it is said: "To render dying declarations admissible evidence, they must be shown to have been made when the declarant is under a sense of impending death, and without any hope or expectation of recovery. Whether so made or not is a preliminary question to be determined by the court in all the circumstances of the case." *Vass' Case*, 3 Leigh (30 Va.), 786, 24 Am. Dec. 695; *Hill's Case*, 2 Gratt. (43 Va.) 595. But when admitted the weight or credit to which such declarations are entitled is a question for the jury.

The testimony of Salyer and Vermillion plainly brings the declarations of the decedent within the influence of the prescribed rule. Indeed, the fact is not questioned but that Dorton was fully conscious of his condition, that death was impending and that he had no hope of recovery. *Hall's Case*, 89 Va. 177, 15 S. E. 517; *O'Boyle's Case*, 100 Va. 785, 40 S. E. 121, *Bowles' Case*, 103 Va. 816, 48 S. E. 527; *Patterson's Case*, 114 Va. 807, 75 S. E. 737. But the specific objections to the admission of the declarations are: First, that response of the deceased to the inquiry whether the

shooting was accidental or done purposely, "Done it a-purpose," was purely an opinion, and not a statement of any fact or circumstance of the occurrence. And, secondly, that the expressions of animosity indulged in by the deceased toward the accused, at the time of making the dying declarations, manifested such a frame of mind on his part as to render the declarations inadmissible. The plaintiff in error relies on *Patterson's Case, supra,* as authority for the first proposition.

That case unquestionably correctly sets forth the general rule that dying declarations are only admissible as evidence in respect to the circumstances of the transaction itself which results in the death of the declarant. Consequently it was held, that declarations of the deceased as to his attitude toward the accused and his daughters prior to the date of the homicide, constituted no part of the circumstances of the transaction and were self-serving declarations and on those grounds were inadmissible. The particular question here, however, involves the admissibility of the statement of the declarant that the shooting was not accidental but intentional, a statement which, if admissible, has vital bearing upon the transaction which is the subject of inquiry.

Professor Wigmore, in his work on Evidence, maintains with convincing ability the proposition, that the rule with respect to opinion evidence has no application to dying declarations. In that connection he says: "The opinion rule has no application to dying declarations. The theory of that rule is that whenever the witness can state specifically the detailed facts observed by him, the inference to be drawn from them can equally well be drawn by the jury so that the witness' inferences become superfluous. Now since the declarant is here deceased, it is no longer possible to obtain from him, by questions, any more detailed data than his statement may contain, and hence his inferences

are not in this instance superfluous, but are indispensable . . ." 2 Wigmore on Evidence, sec. 1447.

The author, with some asperity, criticises the courts for applying the opinion rule to dying declarations. Certain it is, there is much contrariety of opinion on the subject. Nevertheless, as we know of no controlling precedent by this court on the precise point, we feel at liberty, in the interest of human life and the due administration of justice, to adopt and apply the rule enunciated by Mr. Wigmore and the line of authorities cited by him in support of it as founded on the better reason.

In the following cases dying declarations were held admissible: *Sullivan* v. *State,* 102 Ala. 135, 142, 15 South. 264, 48 Am. St. Rep. 22, "He cut me for nothing;" *Gerald* v. *State,* 128 Ala. 6, 29 South. 614, "He killed me for nothing;" *White* v. *State,* 100 Ga. 659, 28 S. E. 423, "He shot me down like a dog;" *Boyle* v. *State,* 105 Ind. 469, 5 N. E. 203, 55 Am. Rep. 218, "There was no cause for the killing;" *Lane* v. *State,* 151 Ind. 511, 51 N. E. 1056, "That the deceased made no attempt to injure the defendant; *Shenkenberger* v. *State,* 154 Ind. 630, 57 N. E. 519, That she was "poisoned by my mother-in-law;" *State* v. *Ashworth,* 50 La. Ann. 94, 23 South. 270, "That he was to blame with his own death," offered by accused; *Powers* v. *State,* 74 Miss. 777, 21 South. 657, "You have killed me without cause;" *Lipscomb* v. *State,* 75 Miss. 569, 23 South. 210, 230. "(1) I am going to die; I have been dead; the good Lord has sent me back to tell you that (2) Dr. L. has killed me, has poisoned me with a capsule he gave tonight, (3) that C. J. had insured his life, and had hired Dr. L. to kill him;" these words were uttered between convulsions; held, by a majority of the court, that (1) and (3) could be separated, and that (2) was admissible; *State* v. *Saunders,* 14 Ore. 305, 12 Pac. 441, "He shot me down like a dog;" *State* v. *Lee,* 58 S. C. 335, 36 S. E. 706, "He shot me for nothing;" *State* v. *Kessler,* 15 Utah 142, 49 Pac. 293, 62 Am. St. Rep.

911, "He shot me down like a rabbit;" State v. Gile, 8 Wash. 12, 35 Pac. 417, He was "butchered by the doctors."

The foregoing are some of the cases relied on to sustain the text. So in Wright's Case, 109 Va. 847, 65 S. E. 19, the statement that declarant knew of no motive on the part of the accused for shooting him, except that he was angry because the deceased had refused to rent him a certain piece of land, was held admissible.as a dying declaration.

In the instant case, the declarant was dying from shock and hemorrhage and his physical condition was such that he could not give a detailed narrative of the constituent circumstances surrounding the shooting. Still the conclusion of fact drawn, perchance, from inexplicable phenomena, the expression on the countenance of the accused, the glance of his eye, or the motion of his hand, silent witnesses to an undeclared purpose, left the indelible impression on the mind of the dying man that the shooting was intentional and not accidental.

We are of opinion that the doctrine of reason and also the decisions of the best considered cases is that the statement of the declarant that the shooting was intentional was admissible evidence.

2. The remaining objection to the admission of the dying declarations is that the expressions of animosity by the deceased toward the accused after the shooting manifested such a frame of mind on his part that the trial court ought to have excluded them.

We are further of opinion that the circumstances upon which this objection is predicated affect the trustworthiness of the declarations rather than their admissibility.

In an exhaustive note on the subject of dying declarations to Worthington v. State (92 Md. 222, 48 Atl. 355, 84 Am. St. Rep. 506), in 56 L. R. A. 353, at p. 421, it is said: "From all that can be gathered from the decisions and dicta of judges upon the subject, it may be said that ex-

hibition of resentment toward the accused on the part of the declarant will not of itself render the declaration of the latter inadmissible, but will go to the weight and value of the same as evidence." Citing *Baker* v. *Com.* 20 Ky. L. R. 1779, 50 S. W. 54; *State* v. *Pearce,* 56 Minn. 256, 57 N. W. 652; *Polk* v. *State,* 35 Tex. Crim. Rep. 495, 34 S. W. 633.

So, in *Hill's Case,* 2 Gratt. (43 Va.) 595, it was said: "It is to be remarked that during the whole time from the infliction of the wound until his death, he never expressed the opinion or belief that he would survive. It is true that he manifested during the night at intervals something like feelings of revenge towards the prisoner. But are such feelings inconsistent with the knowledge of the approach of death? Men of different temperaments are differently affected on such occasions."

II. This brings us to the last assignment of error, namely, that the verdict of the jury is contrary to the law and the evidence.

The dying declarations of the deceased, W. R. Dorton, which we have held to be admissible, answer that assignment. They are in direct conflict with the testimony of the accused upon the crucial issue in the case: "Was the shooting intentional or accidental?" The jury by their verdict have resolved that issue in the Commonwealth's favor, their finding has been approved by the trial court, and upon familiar principles it cannot now be disturbed by this court. Va. Code, 1904, sec. 3484.

Upon these considerations we are of opinion that the judgment of the circuit court should be affirmed.

*Affirmed.*