The evidence amply supported the verdict, and for the reasons set forth in the opinion, the exceptions to the admission of testimony, over objection by the defendant, afford no ground of reversal.
 No. 14792. MARCH 8, 1944.
Herbert Rozier was convicted of murder without recommendation, and excepted to the refusal of a new trial.
Dr. E. B. Claxton, a practicing physician, testified in substance as follows: That he was a doctor engaged in the practice of medicine and surgery and that he owned and operated a hospital in Dublin, Georgia; that about 11:30 at night on or about April 15, 1943, W. G. Davis, the deceased, was admitted to his hospital suffering from a shotgun wound in the left side just below the border of the lower ribs of the chest and abdomen, which was large enough to get a person's hand in it; that intestines of the deceased were protruding out of the opening; that the witness removed some packing and wadding and a good many shot from the wound, from which the deceased died at 2:10; that he was in a dying condition and was conscious of it, and asked the witness if the witness thought he could get well, and the witness told the deceased it was very doubtful. The witness testified that the deceased went *Page 421 
into detail, and told him of hearing a fuss going on at a negro house, and of thinking that he had better go up there and try to quiet them; that the deceased further stated that these negroes had had some previous trouble, and he thought he might go down and get them to settle the difficulty, and that he started toward this house and was going down the road when he met the defendant and said, "Herbert, what is the trouble up there?" and the defendant made no reply but pulled his gun and shot him immediately without making any explanation or saying anything else; and that after the defendant had shot him, he tried to shoot the defendant and fell to the ground and called for Mr. Davidson to get him some help.
Walter Davis testified that he was the son of W. G. Davis, the deceased, and that on the night of April 15, 1943, when his father was killed, the family group were sitting in their front room and heard some shooting at Essie Rozier's (Evans?) house and that it was about one thousand yards to this house around the road; that when this shooting occurred, his father said, "I am going over there," and got his gun and immediately left; that shortly after his father left in the direction of Essie's house, they heard a shot and then a pause and then three rapid shots in succession; that immediately after the shooting he heard his father's voice, and went up to where his father was and asked his father who shot him, to which the deceased replied, "Old Herbert Rozier shot me all to pieces and I am gone;" that he asked his father what was the cause of the shooting, and the deceased replied, "When I met him I asked him what he had been up to, and he didn't even answer me. He shot me." The witness further testified that his father was lying approximately sixty-three yards from where he was shot, and that he then got help from Mr. Davidson's house and took his father to the hospital where the father died.
Mrs. J. H. Davidson Sr. testified that she lived near Pine Hill Church between the houses of Mr. Davis and Essie Evans, a little nearer to the Evans house; that on the night of April 15th she heard some shooting and shortly afterwards heard three shots fired in succession; that she heard Mr. Davis call for her husband, but that her husband was sick and unable to get out of bed; that she first thought Mr. Davis was a negro and would not answer the door, but when she did recognize his voice she got her son out *Page 422 
of bed and they found Mr. Davis lying in the road; that Mr. Davis said he was shot, and after she helped put him in her automobile, her son took him to the hospital; that this happened in Laurens County, Georgia; that Mr. Davis said the negro shot him, but she did not hear Mr. Davis say who the negro was.
J. H. Davidson Jr. testified that he remembered the Tuesday night when Mr. Davis was killed; that he was asleep and did not hear the shots fired; that Alfred Maddox woke him up and that he took Mr. Davis to the doctor; that the only statement Mr. Davis made in his presence was when the car ran over a bump and Mr. Davis said "Oh, me;" and that the witness immediately took him to Dr. Claxton's hospital.
Essie Evans testified that she lived near Pine Hill Church close to Mrs. J. H. Davidson in the community where Mr. W. G. Davis lived; that she knew both Mr. Davis and the defendant Herbert Rozier; that Herbert Rozier was at her house the night the deceased was killed; that Herbert Rozier came to her house and was standing outside the window, and he broke in the house by breaking the latch, and she and her boy ran in a room and shut the door; that Herbert Rozier left the house and went out to where her automobile was and took an axe and beat the glass out of the car and took a knife and cut the upholstery all to pieces; that Herbert Rozier shot at one of her boys, and one of her boys shot at Herbert Rozier; and that after this Herbert Rozier left her house and went down the road, and in approximately five minutes she heard a shot and then three other shots close together.
Ed Evans testified that he was the son of Essie Evans, and was at home on April 15, 1943, when Herbert Rozier came to his house and when he first saw Rozier; that Rozier shot at him, and he dodged around the edge of the house and shot at the defendant but his gun snapped; that he broke in the front door and Rozier broke in the back door; that when the witness went into a room where the family was, Herbert Rozier tried to break in there, and when he failed to break in the door he tried to break in the window, and failing to do this, he took an axe and beat the glass out of their car, the windshield and two side glasses in both the front and rear doors of the car and the lights; that Rozier made quite a bit of noise while he was doing this; that the shot fired by Rozier did not hit him but the powder burned his face; that he shot at *Page 423 
Rozier and Rozier shot at him; that after tearing up their automobile, Rozier went up the road in the direction of Mr. Davis's house; and that the moon was shining bright on that night.
William Henry Lee testified that on April 15, 1943, he went to the spot where Mr. Davis was shot and saw the place; that from appearances it looked as if the defendant had run about twenty steps from where Mr. Davis was shot; that he found a gun in the ditch; that the gun contained a cut shell; and that he gave the gun to the sheriff.
Lula Lord testified that she lived near where Mr. Davis was killed; that on the afternoon before he was killed, she left her home to go to Miss Iris Minton's to do some washing; that while gone she left her own house unlocked, and the next morning in rambling around her house found some trunks broken open, but nothing had been taken from them; and that on Saturday night she missed the shotgun. This witness further testified that she had seen the gun at the office, but could not swear who got it, but she identified the gun at the office as being the one taken from her home.
D. B. Wilkes testified that he was deputy sheriff of Laurens County, and that on April 15, 1943, the shooting was reported to him; that he went down and tried to find the man who did it; that he went to Henry Tolbridge's house, where he knew the defendant was the night he shot Mr. Davis; that the witness saw blood on the floor and tracked the defendant from this house back to the scene of the homicide; that the next morning he found the defendant's tracks, and got Joe Guyton and went across Turkey Creek bridge at a store, and found the defendant in the second house past this store; that it was five or seven miles from the scene of the crime; that when he went in the door of the house where the defendant was, the defendant had a gun and Joe Guyton said to the defendant, "Don't do that Herbert," and the witness told Herbert to drop the gun, which he did, and the witness placed him under arrest; that the defendant made a statement to this witness freely and voluntarily without hope of reward or any promise or any threats by the witness; and that the defendant told the witness he did it because he was mad, and that Essie's boy, Ed Evans, had shot him. This witness also identified a jacket as being the one the defendant was wearing when arrested, and identified blood *Page 424 
stains on the jacket as well as shot holes in the left sleeve of the jacket.
The defendant, Herbert Rozier, in his statement to the jury said that his dog was at Essie's house, and he went after the dog; that it was necessary for him to go under Essie's house in order to get his dog, and while under there some noise in the house frightened him and he came out from under the house, and then he had an encounter with Ed and fired a shot to protect himself, and Ed shot him; that after being shot by Ed he got mad and tore the car up; that after tearing the car up he went down the road where he met Mr. Davis, and was nearly in the ditch when he met Mr. Davis; that Mr. Davis asked him, "What in the hell are you raising so much sand for?" and that Mr. Davis pumped him in the shoulder with a gun and shot him in the hand; that he shot Mr. Davis in self-defense, and the shooting was for the purpose of trying to save himself.
In addition to the general grounds, special exception is taken to the admission of certain testimony, as set forth and dealt with in the opinion.
1. The evidence fully authorized the verdict.
2. "Declarations by any person in the article of death, who is conscious of his condition, as to the cause of his death and the person who killed him, shall be admissible in evidence in a prosecution for the homicide." Code, § 38-307. Thus, dying declarations are not admissible in civil cases (East Tennessee,Virginia and Georgia Railroad v. Maloy, 77 Ga. 237 (2), 2 S.E. 941); and in criminal cases, in order to be admissible they must relate to the cause of death or the person who killed the deceased (Hawkins v. State, 141 Ga. 212 (4), 80 S.E. 711); but any such declaration illustrating these issues is competent to prove any relevant fact embraced in the res gestae of the killing. Wilkerson v. State, 91 Ga. 729 (3) (17 S.E. 990, 44 Am. St. R. 63). Accordingly, every fact or circumstance shedding light upon the transaction, including such conversation and conduct of the parties as are properly *Page 425 
parts of the res gestae of the homicide, may lawfully go to the jury in a dying declaration made by the deceased. Bush v.State, 109 Ga. 120 (3) (34 S.E. 298); Doyal v. State,70 Ga. 134 (4), 146; Strickland v. State, 167 Ga. 452 (4) (145 S.E. 879); Wilkerson v. State, supra; Scrutchens v.State, 146 Ga. 189 (2) (91 S.E. 25); White v. State,100 Ga. 659 (2) (28 S.E. 423); O'Neal v. State, 172 Ga. 526
(158 S.E. 51). Under these rules the court properly excluded the testimony of the doctor which related to the good character and qualities of the decedent, but properly admitted the remainder of his testimony which recounted the dying declaration of the decedent, and explained that the decedent had started to a neighboring house where there had been previous trouble in order to quiet a fuss he heard going on, and that he met the defendant on the way, at which time the homicide occurred. This preliminary statement as to when, how, and why the decedent came to meet the defendant was the portion of the dying declaration objected to; the evidence of the dying declaration as to the homicide itself being that when the decedent on meeting the defendant asked him what the trouble was up there, the defendant without making any reply shot him in the abdomen with a shotgun.
3. There was evidence by the arresting officer of a voluntary statement made to him by the defendant that the defendant shot the deceased because the defendant was mad and because Essie's boy, Ed Evans, had shot the defendant. The State offered the testimony of Essie Evans and other witnesses as to what happened at the house of Essie where the violence occurred: the breaking in of the house and the smashing of an automobile by the defendant, and including the discharge of fire-arms by the defendant and others. This was the house to which the deceased was going when the homicide occurred. It was objected to as irrelevant and prejudicial, in that the deceased was not present at the time the violence occurred immediately preceding the homicide. This testimony corroborated the dying declaration of the deceased as to the existence of the disorder, and was offered to illustrate the motive, malice, intent, and state of mind of the defendant immediately preceding the homicide. Since these transactions occurred immediately preceding the homicide, and since they constituted the cause and occasion of the homicide and clearly tend to explain it, the testimony was properly admitted. As to a very similar situation, *Page 426 
see Helms v. State, 138 Ga. 826, 829 (76 S.E. 353). See also Wilson v. State, 173 Ga. 275 (2) (160 S.E. 319);Price v. State, 166 Ga. 120 (2) (142 S.E. 666).
Judgment affirmed. All the Justices concur.