## 4286.   OWENS *v.* THE STATE.

1. The evidence offered upon the subject of alleged dying declarations was sufficient to authorize the submission to the jury of the question whether or not, at the time the declarations were made, the declarant was in the article of death and conscious of his condition.
2. A statement made by one who had received a mortal wound, that a named person had "assassinated" him, is a statement of fact, and not a mere conclusion or expression of opinion, and, upon the trial for murder of the person who fired the shot, is admissible in evidence as a dying declaration, if sufficient foundation for its admission is first laid.
3. While a trial judge should not so interrogate a witness as to intimate or express any opinion in reference to the weight of the evidence, or as to the guilt or innocence of the person on trial, still it is the right and duty of a trial judge, in a proper case, to assist in the elucidation of the truth of the transaction under investigation, and it is not error for him, for this purpose, to ask a witness questions pertinent to the issue and couched in appropriate language. The questions propounded by the trial judge in the present case were not subject to the criticism that they tended to impress the jury with the idea that, in the opinion of the trial judge, the accused should be convicted.
4. The charge upon the subject of dying declarations, which is copied in the opinion herewith filed, is in exact accordance with previous decisions of the Supreme Court and of this court, and is sufficiently full and explicit, especially in the absence of any written request for more particular instructions.
5. To the end that the trial should be fair and impartial and conducted in an orderly way, it is the duty of the trial judge to regulate the conduct of counsel, parties, and witnesses, provided that in so doing he does not take away or abridge any right of a party under the law.
6. The evidence warranted the verdict, and there was no abuse of discretion in overruling the motion for new trial.

Decided August 6, 1912.

Conviction of manslaughter; from Colquitt superior court— Judge Thomas.  May 25, 1912.

*Edwin L. Bryan, D. B. Nicholson,* for plaintiff in error.  ·

*J. A. Wilkes, solicitor-general, J. D. McKenzie,* contra.

Pottle, J.   1. Owens was convicted of voluntary manslaughter, and his motion for new trial was overruled.  The point mainly insisted on is that the court erred in admitting in evidence certain alleged dying declarations of the person killed.  In order for dying declarations to be admitted in evidence, four things must appear: (1) the statements must have been made by the person killed; (2) he must have been in a dying condition at the time the statements

were made; (3) he must have been conscious of his condition, and (4) they must have been of such character as to make them admissible under the Penal Code (1910), § 1026; that is, the statements must relate to the cause of the death of the declarant and to the person who killed him. In the present case the fact that the deceased made the statements admitted in evidence is undisputed; that he was in a dying condition can not be questioned, because he died a few hours after having made the statements, from a mortal wound which had been inflicted upon him by the accused. The objection mainly urged by counsel for the accused is that it does not appear, from the evidence, that at the time the statements were made, the accused was conscious of his condition, and that the nature of the statements was such as to render them inadmissible as dying declarations.

The question whether sufficient foundation has been laid for the admission of dying declarations is one primarily for the court. Assuming that the statement made is one which would be admissible as a dying declaration, if there is any evidence to support the inference that at the time the statement was made the accused was in articulo mortis and conscious of his condition, it is the duty of the court to admit the evidence and submit to the jury the question whether or not they believe the evidence is sufficient to show that the deceased was in extremis and conscious of his condition at the time the statement was made. They should be instructed to first ascertain whether these things were true, and, if they so find, then to consider evidence of the dying statement and give it such weight as they think it entitled to; and that if they find that the person who was shot was not conscious that he was in a dying condition, then they should reject the evidence in relation to the alleged dying statement altogether. In passing upon the question whether or not one in extremis is conscious of his condition, all of the facts and circumstances must be considered. Statements made by the wounded man himself, statements made to him by his physician or others, the nature and character of the wound, and any other facts or circumstances which throw light on this question should be considered. The fact that the accused shot and killed the deceased is shown by the testimony of eye-witnesses, and is not denied by the accused. His theory was that the killing was done in self-defense, in order to prevent the commission of a felony

upon him, or at least that at the time he shot he was acting under the fears of a reasonable man that his life was in danger. The wounded man lived some sixteen hours after he received the mortal wound. He made five statements to his physician. On direct examination the physician who had attended the deceased testified, that statements in reference to the shooting were made to him by the deceased several times; that the first statement was made about an hour after the shooting, and the last statement from six to eight hours before the death of the deceased. With reference to this last statement the physician testified that the deceased was conscious that he was in a dying condition, because his pulse began to fail, and the witness informed him that his pulse did not respond to a stimulant, and that the deceased was in extremis and was conscious of this fact. The witness testified, that while in this condition, the wounded man said "they assassinated him;" that in addition to this he told the witness to take his sister some message, but never did finish the latter statement. The witness further stated that the deceased said that "old man Owens" had assassinated him; that he never did call the name of the person who shot him other than in this way. In view of the fact that it was not disputed that Owens, the accused, did the shooting, and that Owens and the deceased were in a difficulty at the time the shooting took place, there could be no question, of course, that the deceased intended to refer to the accused when he used the expression "old man Owens." On cross-examination the witness who testified as to the dying statements was examined at great length and in detail in reference to each of the five statements which he claimed the deceased had made to him in reference to the shooting. In reference to the first statement the witness testified that in his opinion the wounded man was not conscious of his condition at the time the statement was made. As to the second statement, the witness testified that the deceased had not abandoned hope of recovery, because he stated, "I may get over this and some day come back here." The same was true of the third statement. The last two statements were made under the following circumstances. The fourth statement was on the train between Moultrie and Tifton, about seven or eight hours after the shooting and about eight hours before death ensued. At that time the physician tried to persuade the wounded man to drink some ginger ale

as a stimulant. He refused to take any, stating that he did not believe it would do him any good, "because he didn't believe he was going to get well." The last statement was made on the train between Fitzgerald and Manchester. The physician again tried to get the wounded man to take a stimulant, stating that his pulse was failing, and he replied declining the stimulant and endeavoring to send some message to his sister, but was never able to complete the message before his death. He said at that time he was going to die. He made no other statement. The following question was asked the witness: "That is all he said to you the last time he spoke to you about it?" Answer: "The last time he said anything intelligent."

It is argued by counsel for the accused that it is apparent from the physician's testimony on cross-examination that in the last conversation all that the wounded man said was, in effect, something about a message to his sister, and that he made no statement at that time in reference to the accused. We do not think this a fair construction of the statement of the deceased. The witness having testified positively, on direct-examination, that when the last statement was made on the train the deceased stated that Owens had assassinated him, the manifest inference from the cross-examination is that the witness meant to say, that, besides making this statement in reference to the shooting, the deceased endeavored to send a message to his sister, and the effort to do so involved the last statement made before his death. The same construction is to be placed upon the testimony of the witness in reference to the fourth statement, made on the train between Moultrie and Tifton. The evidence perhaps did not require a finding that at the time these statements were made the wounded man was conscious of the fact that he was about to die, but it certainly authorized such a finding and warranted the jury, in considering the dying statements and in giving such weight to them as the jury believed they were entitled to receive. See, in this connection, *Smith* v. *State,* 9 *Ga. App.* 403 (71 S. E. 606); *Campbell* v. *State,* 11 *Ga.* 353; *Walton* v. *State,* 79 *Ga.* 446 (5 S. E. 203); *Wheeler* v. *State,* 112 *Ga.* 43 (37 S. E. 126); *Young* v. *State,* 114 *Ga.* 849 (40 S. E. 1000).

2. It is also insisted that evidence as to the dying declarations should have been excluded because the statement of the deceased

was a mere conclusion and opinion, and not admissible as a statement in reference to the cause of death and the person who killed the deceased. The decisions in reference to the admissibility of this class of evidence have not been confined strictly to the terms of the code, and great liberality has been allowed in the admission of evidence of this character. No fixed, definite rule can be announced which would be applicable in all cases and to all statements, but, generally speaking, any statement made by one in the article of death and conscious of his condition, in reference to the cause of his death, the manner in which he was killed, and as to the person who killed him, is admissible if it would have been admissible as evidence had the person wounded not died, and had he been testifying under oath as a witness on the stand. The solemnity of the occasion, the consciousness of approaching death, the common belief that one in that condition, knowing that he is about to appear before his Maker and give an account "of the deeds done in the body," is supposed to take the place of the sanctity of an oath and to justify an inference that one in that condition would not deliberately falsify for the purpose of wreaking vengeance upon one who had inflicted upon him a mortal wound. Whether this supposition is well founded or not is purely speculative. It is doubtless true that it is well founded in many cases, and it is also probable that, under color of dying declarations, false statements have been sometimes admitted in evidence and used against one on trial for murder. This fact makes it a question peculiarly for the jury to determine, under all the facts and circumstances surrounding the transaction, together with any knowledge which they may properly have of the character of the declarant and the character of the assailant, the proximity of death, the nature of the statement, and other pertinent facts or circumstances, whether the statement ought to be accepted as true. In making the statement the declarant can not make a statement of a bare conclusion or expression of opinion, but he must state facts. The statement that the accused assassinated him, as used by the deceased in the present case, simply means that the accused shot him without provocation. This being so, the statement was one of fact, and was not objectionable as stating a mere conclusion or opinion of the declarant. It has been held that a statement by one in the article of death and conscious of his condition, that the accused shot him down

like a dog, was admissible. So also with reference to the statement that the killing was done without any provocation on the part of the person killed, and also the statement that the deceased was "butchered" by the accused. See *White* v. *State,* 100 *Ga.* 659 (28 S. E. 423) ; Underhill, Criminal Evidence (2d ed.), § 108, p. 202. Tested by these authorities, as well as upon the principles announced above, the declaration of the deceased in this case was admissible as a statement of fact, and was not objectionable as a statement of a mere conclusion or expression of opinion.

3. Further complaint with reference to the admission of the dying statement is that the trial judge committed prejudicial error in interrogating the State's witness, in that he thereby intimated an opinion as to the guilt of the accused, and intended to impress the jury with the idea that the court thought that the accused should be convicted. We do not think the examination of the trial judge was subject to this criticism. Indeed, a careful examination of the questions propounded by the court and of the answers of the witness seems to indicate that the witness rather lessened the force of his former testimony on the question as to whether the wounded man was rational at the time the statements were made and conscious that he was in a dying condition. In this examination the court simply required the witness to explain to the jury whether or not the declarant was rational when the statements were made and what the witness meant by the use of the term "rational." It seems to have required several questions to make the witness understand just exactly what the court meant to bring out. The questions were carefully guarded, and do not contain any intimation on the part of the court that the accused was guilty.

4. The court charged the jury as follows: "Now, then, the court instructs you that dying declarations made by any person in the article of death who is conscious of his condition, as to the cause of his death, and the person who killed him, are admissible in evidence in a prosecution for homicide. The court instructs you further that as to testimony touching what are claimed to be dying declarations, the court instructs you that in order to make this evidence at all for your consideration, you must be satisfied beyond a reasonable doubt that the declarations, if any, were made while the person making them was in a dying condition, and that he knew at the time the declarations were made that he was in

such condition; and if either one of these conditions does not exist, the alleged declarations would not be testimony to be considered by you at all, but if both exist, they would become what the law terms dying declarations, and, if made under such conditions, would be testimony to be considered with all the other testimony in the case." The criticism on this charge is that it is not sufficiently full and explicit. The charge is in exact accordance with numerous decisions, both of the Supreme Court and this court; and if for any reason it was not sufficiently full and explicit, counsel for the accused should have requested the court, in writing, to charge with more particularity upon the subject.

5. In another ground of the motion for a new trial complaint is made that while counsel for the accused, on cross-examination, had one of the State's witnesses on the floor before the jury, demonstrating by gestures and signs the respective positions and conduct of both the accused and the deceased, the court remarked: "Nobody can understand that. I can't and the jury can't. Let him come back to the stand, and ask the question. Let him answer anything you want to ask him about it." It is complained that this action of the court unduly restricted the right of cross-examination; particularly in view of the fact that the court had permitted the solicitor-general to examine the witness in the same way counsel for the accused desired to. In regard to this the court certified: "I was sure that neither the court nor the jury could get the evidence of the witness, in the manner in which the examination was conducted at the time I called the witness back to the stand in order that the jury and court might understand what counsel was trying to prove." In the light of this explanation, there was clearly no error in the action of the judge. It is the right of the trial judge to police the trial, and it would take a very strong case of abuse of discretion in such a matter to authorize the reviewing court to interfere. The trial judge understands the situation much better than this court can possibly do from the printed record, and we are quite sure that so able and impartial a magistrate as was the judge who presided at the trial of this case would not consciously unduly hamper or interfere with counsel in the defense of his client. There is nothing in the record of the occurrence as it is presented to us which calls for interference by this court.

6. The evidence warranted the verdict. The deceased was shot

by the accused during the progress of a personal difficulty between them. The circumstances indicate that the deceased first, without cause, made an assault upon the accused, and that at the time the assault was made he had a knife in his hand and indicated a purpose to use it. The theory of the defense was, that at the time the fatal shot was fired the deceased was making a felonious assault upon the accused with a knife; that the accused had retreated as far as he could with safety, and that it was necessary for him to shoot in order to save his own life. There was, however, evidence to authorize the theory of the State that the deceased had dropped the knife before the shooting took place and that at the time the shot was fired the deceased was not attempting to commit a felony upon the person of the accused, and that there was no necessity for the accused to take his life. It appears, from the testimony of one witness, that after the shot was fired the accused walked about fifteen feet and picked up the knife which had previously fallen from the hands of the deceased. It was argued in the brief of counsel for the plaintiff in error that there was no evidence to show that at the time the shot was fired the accused knew that the deceased had dropped the knife. From the nature of the case there could be no positive direct evidence that the accused knew this, but the fact that the knife was a long butcher knife, the fact that the parties were very close together, with their hands touching each other, and other circumstances surrounding the transaction, all indicate that the accused must have known that the deceased did not have the knife, and that the killing was the result of that passion, supposed to be irresistible, which had been engendered by the assault made by the deceased and the language which he used at the time. The trial judge having reviewed the evidence upon the motion for a new trial, and having signified his approval of the verdict, and there being evidence to warrant the finding, and no error of law having been committed, this court has no power to set aside the conviction.

*Judgment affirmed. Russell, J., absent because of illness.*