# WILLIAMS *v.* THE STATE.

No. 9230.  JULY 14, 1933.

*Isaac S. Peebles Jr., F. Frederick Kennedy,* and *Barwick & Mahoney,* for plaintiff in error.

*Lawrence S. Camp, attorney-general, George Hains, solicitor-general, T. R. Gress,* and *John M. Graham,* contra.

BELL, J. J. M. Williams was convicted of the offense of murder in the alleged killing of his son R. G. Williams, and in accordance with the recommendation of the jury was sentenced to life imprisonment in the penitentiary. The defendant's motion for a new trial was overruled, and he excepted. Besides the general grounds, the motion for a new trial contained a number of special grounds assigning error respectively upon the admission of evidence over objection, upon certain portions of the court's charge, upon the refusal of requests to charge, and upon the overruling of a motion to declare a mistrial based upon alleged conduct of the trial judge.

The State relied solely upon circumstantial evidence, and it is earnestly insisted by counsel for the plaintiff in error that the evidence was insufficient to support the verdict. We can not agree to this contention. The record fairly bristles with circumstances tending to show the guilt of the accused, and contains sufficient, if not abundant, evidence to authorize the verdict of guilty. The deceased was a young married man and had been enlisted in the United States Navy for several years. At the time of his death his station was in New York City. The defendant was a minister of the Gospel, located at Rochelle in Wilcox County, Georgia. The deceased had recently visited his father in Rochelle, and at the time of his death was supposed to be returning to his station in New York City. At about 6 o'clock on the morning of August 5, 1931, his dead body was found in the yard adjacent to Lombard's Mill, which is situated in Richmond County about nine miles south of Augusta, and near the paved highway known as State route No. 1. This was about 175 miles from Rochelle. The deceased was lying upon his back, with a pistol wound in his left temple and with a like wound in his chest. The bullet which entered his chest penetrated his body, and though lodging in the back of his shirt, left its imprint upon the ground. His coat was carefully folded and laid across his stomach, and his left hand was resting upon his coat. His right arm was in a natural position by his side, and his feet

were placed together. There was a mark upon the ground "where the left foot had been pushed up to the right foot." There was no evidence of a struggle anywhere about the body, but there were the tracks of an automobile not far away, together with the tracks of a man by the side of the car, with evidence of trampling at that point. The State's theory was that the young man was drugged or struck while in the car and then laid upon the ground and shot. While there was no direct proof in support of this theory, the evidence authorized the inference that the young man was taken from the car in a helpless condition, and was shot while lying upon the ground at the identical place where he was afterwards found. His weight was said to be about 155 pounds, and the evidence tended to show that his father was a man of at least normal strength. From the above statement it will be seen that the very condition of the body indicated that it had been arranged by some one who had a lingering care for it. An envelope bearing the name and address, "Rev. J. M. Williams, Rochelle, Ga.," was found in one of the pockets of the deceased. This could have been consciously left as a means of identification.

On July 23, which was about 13 days before the death of the decedent, the defendant appeared at the naval station in New York, having made the trip by automobile, and requested his son to go home with him. On being informed by a naval officer that the son had exhausted his furlough privileges for the year and could not be allowed to leave except in case of emergency, the defendant stated to the officer that the young man's sister was very ill, and that he would doubtless never see her alive again unless he was permitted to go. The evidence showed that while a sister of the deceased was at the time under medical treatment, she was not in bed and her illness was scarcely known to any of the neighbors. The defendant did not disclose to his friends that he had made the trip to New York, but stated to several of them that he met his son in North Carolina. On Monday, August 3, the defendant left with his son for Atlanta, where his son was supposed to take a bus for his return to New York. The defendant was next seen in Rochelle as he drove into his garage at about 4 o'clock on Wednesday morning, August 5. A few hours later he was notified of the discovery of his son's body at Lombard's Mill. On receiving this message, he remarked that his son "was murdered for his money;" that "he had around

$125 on his person." The evidence authorized the inference that the son was without funds, and that this fact was known to the defendant. The naval officer stated to the defendant in New York City that the son did not have sufficient money to make the trip back to the naval station and that the father would have to be responsible for his return. The defendant claimed that he left his son at a bus-station in Atlanta at 11 o'clock on the morning of August 4. The proprietor of a filling-station situated several miles south of Atlanta testified that at that hour the defendant with his son was at the witness's filling-station, and that the defendant was inquiring the way to Augusta, the whereabouts of defendant both in Georgia and in the east having been traced by his use of a Gulf Refining Company credit card. A rain had fallen in the vicinity of Lombard's Mill at about 10 o'clock on the night of August 4, so that the tracks of the car near the body were plainly discernible on the following morning. All four of these tracks proved to have been made by Fiske de luxe tires: and although the officers in Augusta made diligent search covering a period of several days, they were able to find only one other car using this type of tire, and this was a Ford, whereas the defendant's car was a Dodge sedan and used a larger size. Witnesses testified that the tires found on the defendant's car were Fiske de luxe tires, and that they corresponded perfectly with the tracks in the millyard. In leaving the yard, the tracks led toward the south, that is, in the direction of Rochelle. A human track at the scene of the crime also corresponded with a shoe worn by the defendant. It is insisted that tracks alone do not amount to sufficient evidence; but even so, they may be considered with other circumstances.

The defendant stated that after leaving his son in Atlanta he came directly home, arriving at about midnight. None of the other members of his family were at home at the time; and he introduced no evidence in support of this contention, except that two witnesses testified to having seen him pass through Cordele at about 10 o'clock of the same night. A witness who lived in Warren County, five miles from Warrenton and two miles from Norwood, testified that somewhere between 9 and 10 o'clock on a night "during the first part of August" a car drove up to his house "and stopped and blew the horn." The witness approached the car, and the driver stated that he was lost, and inquired the way to Augusta. The wit-

ness saw that the car was a Dodge sedan and that at the rear was a tire-cover that "had a Dodge trade-mark on it, and Albany, Georgia." The other evidence showed that the defendant had purchased his car in Albany, Georgia, and that the car had such a tire-cover on it. The witness had electric lights at his house. At the trial this witness did not positively identify the defendant as the inquirer, but stated, "It is just like him," and that he had told the defendant's attorney that he was "a twin-brother, if he was not the man." The witness had recalled the incident upon reading an account of the defendant's arrest early in September; and that while he was unable to state the exact date of the inquiry, it was not in July and could not have been as late as August 10. He further testified that there was a boy in the car at the time. "Looked like about 21 or 22 years of age. He was sitting in this car like he was tired. . . He was leaning over on his side." The evidence showed that Warrenton was on the highway from Macon to Augusta. In the brief of counsel for the plaintiff in error is the statement that this witness lived about 55 miles from Augusta. The record does not show the exact distance.

The coroner of Richmond County arrived at the scene of the crime at 9 to 10 o'clock on the morning of August 5. The defendant contends that rigor mortis had not set in at that time, and that the killing must have occurred so recently theretofore that the defendant could not possibly have committed the crime and thereafter made the trip to his home in Rochelle by 4 o'clock of the same morning. Physicians testified that there is no exact period between the occasion of death and the manifestation of rigor mortis; that normally rigor mortis is presumed to take place at from two to three hours after death, but that the period will vary and in some cases a much longer period elapses. One witness testified that the period might be as long as twenty hours or more. The evidence showed that the body had stiffened to some extent when it was first discovered at 6 o'clock in the morning. When the body was turned, the feet retained their relative positions and went over together. The right arm flexed a little, but it was evident that the neck had also stiffened. After the defendant's arrest an officer drove the defendant's car from Rochelle to the scene of the crime in about three hours. The jury could have found that the homicide was committed as early as midnight, or at such other hour as allowed ample

time for the defendant thereafter to reach home by four o'clock in the morning. After receiving notice of his son's death, the defendant remained for some time in Rochelle, having dinner with a friend and chatting a while before departing. He arrived in Augusta about night, and left for his home about noon the next day, before the formal inquest was held. While insisting that his son had come to his death at the hands of robbers, he offered no assistance to the officers in solving the crime. He suggested that his son must have been the victim of some plot which originated in Atlanta. The Richmond County officers requested that he make an investigation in pursuance of that theory, but, so far as appears, he failed to do so.

A negro woman testified that she washed a shirt for the defendant with the regular family laundry about a week after the homicide, and that there were bloodstains on the shoulder and the sleeve. The defendant made no effort to explain this circumstance. Several days before he made his trip to New York he borrowed a pistol from a neighbor, a 38-caliber Smith & Wesson, saying that he was going on a trip to North Carolina for a little rest and vacation, and wanted the pistol for protection. A kinsman of the lender called for and obtained it from the defendant on August 20. The defendant later made an inconsistent statement as to the purpose for which he had borrowed this pistol, and even stated that he had returned it before his trip to Atlanta. The evidence tended to show that the pistol was fired twice while in his possession or custody. The pistol together with the two bullets which were taken from the dead body were carried to a ballistic expert in New Orleans, who after experiment and examination attended the trial as a witness and testified that in his opinion these bullets, hereinafter called the evidence bullets, were fired from the identical pistol. The witness further testified that in the manufacture of a pistol the barrel is made first by drilling, and then by reaming, and that in the reaming process the reamer, by wearing, gradually undergoes a change of form, and will leave identification marks in each barrel different from those in any other barrel made by the same manufacturer and finished with the same reamer. The result is that each barrel contains its own peculiar lands and grooves, and every bullet fired from the same pistol will bear the imprint of these marks. The witness testified that he had tested the pistol by firing other bullets therefrom, and that by a microscopic comparison of the test bullets with

the evidence bullets he found that each bullet carried the same identification mark. The test bullets and the evidence bullets were all introduced in evidence, and were examined by the jury under a microscope. At the instance of the State, the witness also made tests and experiments in the presence of the jury. The name of this witness was Maurice O'Neill, and according to his testimony he was superintendent of the Bureau of Identification of the Police Department of New Orleans. He had held this position for about eight years, and from his own evidence as to his study and experience, together with the demonstrations made by him before the jury, they were authorized to give credence to his testimony.

It appeared that the defendant had not seen his son for several years; and that when the boy ran away and joined the navy in 1928, the defendant stated that the son "could no longer make his house his home; he felt he could be an injury to the other children; of course he could come home on a visit, but he must get away soon." Furthermore, there was evidence to show motive. On May 16, 1931, the defendant traded with J. W. Bush Motor Company of Albany, Georgia, for a new Dodge sedan, giving his notes for a balance of $600, and executing a conditional-sale contract whereby the seller retained the title to the automobile until full payment of the purchase-money. Within a short time thereafter, the defendant obtained several additional loans from different persons upon the same automobile, by representing to each respectively that the car was free from liens, and by executing a new mortgage or lien thereon. One of these additional loans was obtained in Augusta, Georgia.. During the months of June and July, the defendant bought and sold cotton on margin, and lost several hundred dollars. His account with one broker was closed on June 26, leaving an indebtedness to the broker of about $85. His account with another broker was closed on July 14, with an indebtedness of $420. Each account was still unpaid at the time of the trial. The deceased at one time carried insurance in the amount of $7500 in favor of his father. The insurance was in two policies, one for $2500, and the other for $5000. After his marriage the deceased caused the $5000 policy to be changed and made payable to his wife. The evidence authorized the inference that the defendant was apprehensive lest the other policy might be changed in like manner. After his son's death, the defendant promptly collected about $2500 on the policy

in which he remained as beneficiary. The proceeds of this policy were deposited in a bank in Albany, Georgia, on September 5. The defendant was arrested on September 6, but in the meantime he had drawn checks amounting to about $1600, three of which were payable to the holders of conflicting liens against the automobile.

The foregoing is a statement of what could have been found as facts by the jury. There were still other circumstances from which inferences unfavorable to the accused could have been drawn. In his statement he sought to explain or refute some, but not all, of the evidence introduced on behalf of the State. By his evidence he sought to prove an alibi. As before stated, he contended that he returned from Atlanta directly to his home on the afternoon and night of August 4. The only testimony in support of this contention came from the two witnesses who testified that they saw him in Cordele at about 10 o'clock that night. Under all the circumstances, including some impeaching testimony, the jury were not bound to believe the evidence of these witnesses. We have no hesitancy in holding that the evidence was sufficient to support the verdict. Besides the many other convincing circumstances, the testimony of the ballistic expert tended strongly to connect the defendant with the commission of the homicide. In State *v.* Boccadoro, 105 N. J. L. 352 (144 Atl. 612), it was contended that there was no sufficient evidence to identify the defendant as the murderer. Besides proof of some other incriminating circumstances, the State introduced the evidence of ballistic experts whose testimony was similar to that of the expert in the present case. The court held that these various facts, taken together, made the question of the defendant's guilt one for the determination of the jury. See also Evans *v.* Commonwealth, 230 Ky. 411 (19 S. W. (2d) 1091, 66 A. L. R. 360).

■ In three grounds of the motion error was assigned upon the admission of testimony to the effect that the defendant had procured loans from different companies by the execution of conflicting liens upon the same automobile. In one instance the evidence was objected to upon the ground that it merely attempted to show a separate and distinct offense, and was irrelevant and illustrated no issue in the case. In the other two instances the evidence was objected to upon the ground that it was irrelevant and immaterial, and was intended and calculated to prejudice the minds of the jury

by attempting to show that the defendant was a man of limited financial means and would likely commit a crime to obtain money with which to pay the loans. In two grounds it was complained that the court erred in admitting evidence that the defendant, a few weeks before the homicide, had lost money in the purchase and sale of cotton futures, and was still indebted to his brokers as a result of these transactions, the evidence having been objected to upon the ground that it was irrelevant and immaterial and was harmful to the movant, in that it tended to prejudice the minds of the jury by showing that the defendant was a man of limited financial means and was indebted to his brokers, and the court having admitted the evidence for the purpose only of showing motive, and the only inference being that "if the defendant was in pecuniary straits, he would probably murder his son in order to pay a simple indebtedness that he owed."

The defendant presented five requests to charge the jury, all of substantially the same character and of which the following is an example: "If any evidence has come into the case about the defendant Mr. Williams' urgent need for money at the time, or his poverty, or financial embarrassment, you must not consider it; for I here and now rule it out of the case, and instruct you to find a verdict free from all such considerations." All of such requests were refused by the trial judge, and in five grounds of the motion for a new trial error is assigned upon their refusal.

We have here endeavored to group ten grounds of the motion for a new trial as being in some measure related to a common question. The evidence as to conflicting liens was not inadmissible upon the ground that it tended to prove the commission of a separate and distinct offense; and this is true notwithstanding the evidence that the defendant had stated to one or more of the lenders that the automobile was free from other liens, and that he had thus procured the loan or loans under false pretenses. "Evidence of the commission of one crime is not admissible on the trial of the defendant for another crime, where the sole purpose is to show that the defendant is guilty of such other crime; but such evidence is admissible where there is some logical connection between the two from which it can be said that the proof of the one tends to establish the other; as where the extraneous crime forms part of the res gestæ, or tends to prove malice, intent, motive, or the like." *Wilson* v.

*State,* 173 *Ga.* 275 (2) (160 S. E. 319). The evidence as to conflicting liens tended to show motive, and was thus admissible under an exception to the general rule as to proof of other crimes.

Aside from this question, the several grounds referred to made the common contention that the jury should not have been permitted to consider the defendant's financial circumstances. To sustain this contention counsel rely upon *Johnson* v. *State,* 128 *Ga.* 71 (3) (supra). The present case is distinguished from the *Johnson* case. The defendant in that case was charged with the homicide of his father. It appears from the report that the solicitor-general was permitted to introduce testimony that the defendant knew that his father had insurance upon his life and that he had money in bank. This evidence was held to be admissible as tending to show motive, but the court further said that it was error to admit evidence that the accused was living in indigent circumstances and in need of money. The facts of that case were so meager upon the question of motive that it was held that proof as to the financial condition of the accused did not sufficiently illustrate that question to render the evidence in regard thereto admissible. In the present case the evidence was far more extensive in its scope, and it would be a glaring misconception of its import to say that it related merely to the defendant's financial circumstances. The defendant, though a minister of the Gospel, embarked upon a series of transactions, which, if they came to light, would tend to discredit him in his profession, and which might otherwise result in trouble and embarrassment to him. The jury were authorized to infer that for the purposes of obtaining money with which to engage in speculation he executed conflicting liens upon his automobile, and that when he had lost in his speculative venture he was faced with the prospect of a criminal prosecution, together with disgrace and removal from his profession as a minister. There remained in his name a policy of insurance upon the life of his son, and he might have believed that by realizing on this policy he could save himself from the desperate situation into which he had drifted. All of the evidence herein referred to was admissible upon the question of motive. It was not limited to the defendant's financial condition, and did not fall within the ruling in the *Johnson* case.

In *Bulloch* v. *State,* 10 *Ga.* 47 (54 Am. D. 369), it was held that on the trial of an indictment against a bank officer for embezzling a

large sum of money from the bank, evidence that he was in straitened circumstances, and was dealing in a heavy amount, shortly before the larceny, in the purchase of lottery tickets, thereby creating a necessity upon him for the use of large sums of money, was admissible for the consideration of the jury in connection with the other facts exhibited by the record. In *Bridges* v. *State,* 103 *Ga.* 21 (3) (29 S. E. 859), it was held: "Upon the trial of one indicted for the offense of embezzlement, it is competent for the State, after showing the receipt by the accused of the public fund alleged to have been embezzled and his failure to account for the same, to introduce evidence that at or about the time the embezzlement was alleged to have been committed the accused was pressed for money and resorted to devious methods in order to obtain it, that he gave false accounts as to the disposition of the money so entrusted to him, and in making such account had endeavored to conceal the real state of affairs by forging and uttering receipts and other papers which were presented by him as vouchers. Such evidence is admissible, not as direct evidence of the unlawful conversion, but as showing circumstances from which the jury may draw such inferences as they may believe the circumstances so proved would authorize." In *Govatos* v. *State,* 116 *Ga.* 592 (42 S. E. 708), it was held that in the trial of one charged with converting the money of another to his own use, it was competent to prove that at the time of the alleged conversion the accused was in debt and in need of money, such evidence to be considered by the jury in determining what was the motive of the accused. In *Burley* v. *State,* 130 *Ga.* 343 (60 S. E. 1006), it was held that in the trial of one for murder, "any pertinent fact which, of itself or in connection with other circumstances, tends to show a motive for the defendant to commit the crime charged against him is relevant." Assuredly the evidence objected to in this case was competent and pertinent upon the question of motive, when considered with the other facts and circumstances.

The decision in the *Johnson* case was rendered by five Justices, and the ruling there made will not be extended. Because the facts of the present case are materially different, affording ground for distinguishing the two cases, we need not now go so far as to say that the ruling in the *Johnson* case would not be followed on a similar state of facts. From what has been said, the court did not

err in admitting the evidence objected to, or in refusing the written requests to charge.

In one of the grounds of the motion for a new trial it was alleged that the court erred in refusing to declare a mistrial because of the conduct of the court in reference to the cross-examination of the witness Maurice O'Neill, who had been called as a witness for the State, and who had testified as an expert that in his opinion the bullets taken from the body of the deceased were shot from a pistol shown to have been in the possession of the defendant. The following is a substantial statement of the facts touching this assignment of error: After the witness had thus testified on direct examination by the solicitor-general, the defendant's counsel, by way of cross-examination, presented to the witness two bullets with the request that he examine them and give his opinion as to whether they were both fired from the same pistol, or from different pistols. The solicitor-general objected to this procedure unless the defendant would compensate the witness at the rate usually charged by such experts, contending that the witness was entitled to be compensated for such independent experimentation before being required to testify. The court sustained the objection, but error is not assigned upon this ruling. The defendant's counsel had cross-examined the witness at considerable length with regard to the matters about which he had testified. The witness left the stand, and twelve other witnesses were examined during the remainder of the same day. On the following morning the trial judge, conceiving that he had committed error in refusing to permit the cross-examination as to other bullets, stated to counsel for the defendant that he had "decided not to leave any of that out," and that as soon as the witness should come in the solicitor-general would have him "set up his machine," and the defendant's counsel would be allowed "to go on with him." Judge Barwick, of counsel for the defendant, then stated that the bullets and pistols about which he desired to interrogate the witness were at his home in Louisville, and that if he had known the night before that this test could be made, he would have had them in court. The trial judge stated that he would allow sufficient time "to get them;" to which counsel replied, "We will confer about that." The court: "Yes, sir, we will let you get them. Now, gentlemen, remember I will allow you the opportunity to ask the witness any question or any

examinations you want to make of him." The case proceeded through the testimony of three additional witnesses, after which the court stated to the defendant's counsel, "Here is Mr. O'Neill in court and willing and ready to make any comparison of any bullets or anything else that you have got in this case. We have made arrangements about that." The defendant's attorney replied: "We understand he is accessible. Call Mr. Bowers [a witness for the defendant]. I presume his fee is paid or offered to be paid by"—. Here the attorney for the defendant was interrupted by a statement from the trial judge, to the effect that as a court he would take care of the expense and would see that it was paid in some way without cost to the defendant, and that he (the judge) wanted the defendant "to have the advantage of anything that can be offered" to him. Judge Barwick: "I believe it is already in the record that the bullets are in Louisville." The court: "I will excuse any attorney or any agent that you want to send for the bullets or pistols." Judge Barwick: "I don't imagine that the attorney can perform his duties here in the trial and be somewhere else at the same time."

Besides the witness Bowers, eighteen other witnesses were then called and examined in behalf of the defendant. The defendant also made his statement. Judge Barwick himself was then sworn as a witness, and testified on direct and cross-examination. After he had concluded his testimony, the trial judge addressed him with this question: "Judge, you are one of the counsel for the defendant?" Answer: "Yes, sir." Question: "You are the one who wanted to ask this ballistic expert some questions yesterday when the question arose as to fees?" Answer: "Yes, sir." Question: "Have you those bullets and pistols in Augusta now?" Answer: "No, sir." Question: "And you have made arrangements to have them here at 3:30?" Answer: "I am trying to get them here. I don't know whether I can or not. I have been trying to get them here." Question: "I will ask you this further question, where are they, Judge?" Answer: "Mr. Mahoney knows about that. He is the man that handled that." The court, to Mr. Mahoney: "You know where they are?" Answer: "Yes, sir." The court: "You see my position. I want to give you full opportunity to put up everything you can." Counsel for the defendant: "We understand." Sixteen witnesses were then examined, and at the hour of 3:30 in the afternoon the following additional colloquy occurred, in

which, as will be seen, the motion to declare a mistrial was made: The court: "Just one minute now, gentlemen. We have had Mr. O'Neill, the ballistic expert, to set up his machine here to compare the bullets that you wanted compared. Are you ready to go on with that phase of it?" The defense: "We are not, your honor. Judge Barwick is off, making some investigations and making some preparations in reference to this case. We did want to go into it yesterday as a part of our cross-examination. Judge Barwick was prepared to go into it at that time. We were refused that privilege. Now at this time the court has the machine placed here, and although the court has stated that he would permit Judge Barwick and excuse him from the court-room, he is now away when the offer is now made. We respectfully submit, under the circumstances, this is error." The court: "This morning when the court began, we offered you the same opportunity. Judge Barwick came up to the bench a few minutes after that, and asked if you decided to do so, if you could do this at 3:30 this afternoon, and I told him that he could, and we have had the machine set up for that purpose. When he was on the stand he said Mr. Lawrence Mahoney, one of counsel for the defendant, had charge and custody, I believe—was that correct?—of these bullets and pistol. Mr. Mahoney came up to the bench. I called him up, and he said he had sent after them. Now, has your man come back with them, Mr. Mahoney?"

Mr. Mahoney: "It has developed, your honor—when I got back to Louisville last night, after we had requested several times and been denied the opportunity to examine the witness, that the owners come and got them. I had borrowed them from men who run business houses and had them there for protection." The court: "Who is the man?" Mr. Mahoney: "Some of the men down there. I think I had about five or six guns. I believe that I have three of them now." The court: "Well, where are the bullets? You told me you had sent for the bullets?" Mr. Mahoney: "Yes, sir." The court: "Where are they?" Mr. Mahoney: "I believe that we have some of them here. Judge, I don't believe that we have them all." The court: "Now listen, the court is not going to be put in the position of not permitting you to put up, at the State's expense, if necessary, all of the evidence that you can get; and that is why I am saying this to you again, out of the abundance of precaution. If you have any bullets—and that is what you wanted

examined—what you presented to be examined yesterday were two bullets, and if you have any bullets to be examined by this witness, you will be permitted to do that. The only thing that you presented yesterday to be examined were two bullets. Now, I want you gentlemen to be just as frank with the court as we are with you. If you care to use them, you are at liberty to do it and have them examined by the witness. If you do not care to do that, I think in perfect fairness to all that you should so state. I will ask you this question: Have you the bullets, Mr. Mahoney?" Mr. Mahoney: "Your honor, to be frank with you, I will tell you what; after I got back to Louisville—I had about eight or ten bullets up here yesterday, and I got them all mixed up. I wanted to give them a fair test, and I am afraid that I have lost track of what bullets came from what guns. Now, that is the truth of the situation." The court: "Well, I will keep this witness over until this [?] morning. I don't care at what stage this case has progressed, I will keep it open until the morning. You say you have four or five of them here now. You can have those examined if you want to. If you have any others that you want to get, why we will hold that phase of it open until the morning and you may have those examined. If you want to take any revolver at all, and as I understand from the witness has been done—any gun fired off in the court-room, and those bullets examined, you are at liberty to have that done. You see what I want, gentlemen. I don't want to be in the position of shutting you out of anything that you want to put up that is legitimate in the trial of the case." Defense: "Will your honor permit the jury to withdraw?" The court: "Yes, gentlemen of the jury, retire for a few minutes."

After the jury had retired, the following took place: Defense: "May it please the court, on yesterday when the witness had subjected himself to cross-examination, with the machine before him, in which he contended he could place two bullets that came out of the same gun and match them, Judge Barwick, in behalf of the defense, made a request of the witness that he match those two bullets, or see if he could match them. The solicitor-general then objected on the ground that this witness had come over here freely and voluntarily, only for his own expenses, and that if he was going to make any test it would be necessary for the customary fee to be paid. Counsel for the defense stated they had no money with which

to pay him. We were then and there on yesterday denied this privilege of cross-examination, or to require the witness to make a test that he then stated he could make in fifteen minutes to an hour. We respectfully submit that a material right of ours at that time and place—when the attorney present had his bullets in court and was in a position to cross-examine him,—we respectfully submit that we were deprived of a substantial legal right then and there. Now, we contend further that for the court on two different occasions to have invited us, with this machine to make this test, in the presence of the jury, and, in effect, as the record will show, to argue with us, 'Now you have got an opportunity. If you want to test out the machine, go ahead and do it,' the effect of it being that if we didn't do it we were afraid to do it, and having the effect of prejudicing the defendant's position to the jury. Mr. Mahoney tells you that his bullets have been mixed in such condition that he couldn't well do that at this time; that he doesn't know which bullet is which. And that in addition to this, during the morning hour the court offered to excuse Judge Barwick to go off and make such investigation as he wanted to in reference to getting these bullets. It develops that Mr. Mahoney has some of those bullets, but they have been mixed up. I am not attempting to set forth in toto what has occurred in the presence of the jury, but we respectfully submit that the court's action in bringing the witness in with this machine—I do not use the word bulldoze, but to insist and invite us and things of that kind, is of such prejudicial nature and character as to warrant us to ask for a mistrial, which we now do."

The court: "When Judge Barwick came up this morning and asked if we wouldn't hold—if they could go ahead with that examination of the bullets, if you decided to do so, at 3:30, I told him that he could do it. Just before we adjourned for dinner, I asked the solicitor-general to ask the expert witness, Mr. O'Neill, to set up his machine during the hour of recess, in order to accommodate you to that extent. All right. Call in the jury." When the jury had returned to the court-room, the judge gave them the following instruction: "Gentlemen of the jury, in the discourse of such questions and answers by the court and attorney in this case in reference to some proposed testimony or the like, of course you have nothing to do with that, and just that part of it you just eliminate from your minds. That is just a matter of procedure in

the case. You are to try this case solely and only on the evidence adduced to you on the stand, along with the prisoner's statement." Several hours later the judge dictated the following statement to the reporter in the presence and hearing of counsel for the defendant: "Now, at 20 minutes to 7 p. m., the trial of the case when the evidence has about been concluded, the court has kept over the expert, Mr. O'Neill, for the purpose of allowing the defense to examine him on the comparison of their bullets which they have, under his machine for that purpose. The court also expressed a willingness to keep him over until to-morrow morning, even after the argument starts, to allow them to examine him in any way they choose concerning ballistics or any other matter; whereupon Judge Barwick announced to the court (and this is said and done in the absence of the jury) that he would confer with Mr. O'Neill and let the court know whether he desired him kept over for such purpose, and after conference with him Judge Barwick announced to the court that they had no desire to examine him further, and that the court may let him go." Mr. Barwick: "That is correct, Judge." The court: "Add to that that no technical point is made on his failing to be allowed to cross-examine the witness at the time they desired in the beginning." Mr. Barwick: "Yes, sir. We are not going to take you up on that."

In view of these facts, the defendant made the following assignment of error in his motion for a new trial: "A mistrial should have been declared, for after the defendant had been denied his legal right to test the witness as to his ability as a ballistic expert and the case had proceeded by the taking of testimony of other witnesses, the court on four separate occasions tendered the witness to the defendant for the purpose of making said test, after the defendant's counsel had announced that they did not care to examine this witness further, and the effect of continuously calling the matter of such test to the attention of counsel and jury was to leave and create an impression that defense was afraid to make such examination and the further impression that the court was of the opinion that, if such test was made, it would develop that the witness could probably identify the test bullets presented to him by the defense. The movant waived his objection as to the court's not permitting him to have the cross-examination of the witness O'Neill and have him to make a test of bullets, but the motion for mistrial was based on the

court's on two or more occasions having invited counsel for the defense to cross-examine O'Neill; and further, when M. C. Barwick, of counsel for defendant, was on the stand as a witness in connection with another matter, and after the witness had been tendered to the defendant for the making of said test and such privilege declined, the court of its own motion further interrogated the counsel in reference to its having O'Neill make a test of the bullets." In approving this ground the judge made the following statement: This ground of the motion "deals with the refusal of the court to grant a mistrial. In addition to what is there set forth, may I make this explanation? The cross-examination by the defense of this expert witness began late in the afternoon. My refusal to make the expert witness test the bullets presented by the defense was a mistake. When I had thought it over during the night, I decided it was a mistake, regardless of cost. So when court opened the next morning, I told counsel for the defendant to make any examination of the expert witness they desired. The answers from them led me to believe they might do so. Mr. Barwick, who handled only the ballistic phase of the case, was late, and came in after court started. When he arrived, the court informed him that he could examine the expert in any way he desired. Mr. Barwick came up to the bench and asked if he could go ahead at 3:30, at which time the court began after recess for lunch. The court instructed the solicitor-general to have the expert set up his machine during the lunch hour and be ready to make the test for the defense when court began at 3:30 o'clock. At the beginning of court at 3:30 o'clock the court announced that the machine was set up, which was done at Mr. Barwick's suggestion, and they could go ahead and examine the expert witness. Counsel for the defense refused to do so, for the reasons set out in the amended motion. The court then for the first time began to feel that counsel for the defense did not really wish to examine the ballistic expert, but wished to avail themselves of what they thought to be an error of the court in not compelling the witness to examine the bullets when first presented by counsel for the defense. At 6:40 o'clock, just before recess for the night, the court called all counsel up to the bench, in the absence of the jury," and then and there dictated to the reporter the final statement which is quoted in the motion for a new trial. It further appears that at the very outset of the charge the court in-

structed the jury as follows: "I charge you, gentlemen of the jury, throughout this long trial whatever colloquy has taken place between counsel and the court in reference to law or contentions or evidence, or the like, you are to obliterate that entirely from your mind and consideration. That is no part of your duty—to concern yourselves about that. You are to try the case according to the law and evidence, along with the prisoner's statement as delivered on the stand."

The court did not err in refusing to declare a mistrial. The movant expressly stated in his motion for a new trial that he waived his objection to the refusal of the court to permit him "to have the cross-examination of the witness O'Neill and to have him make a test of bullets," and that the motion for a mistrial was based upon the fact that the court on two or more occasions invited counsel for the defense to cross-examine the witness; and upon the further fact that, when one of the attorneys for the defendant was on the stand as a witness in connection with another matter, the judge of his own motion interrogated the attorney in reference to proceeding with the cross-examination of the witness O'Neill. Upon a consideration of all the facts, it appears that the assignment of error is incorrect in the statement that the motion for a mistrial was based in part upon the action of the trial judge in interrogating the attorney for the defendant as last indicated. This matter was not included in the motion for a mistrial. The assignment of error is also incorrect in stating that the court on four separate occasions tendered the witness O'Neill, "after the defendant's counsel had announced that they did not care to examine this witness further." On the contrary, it appears that the matter of further cross-examination was allowed by the defendant's counsel to remain altogether in suspense until they finally moved for a mistrial. It is insisted that the conduct of the trial judge in continuously calling the matter to the attention of the defendant's attorney had the effect of impressing the jury "that the defense was afraid to make such examination," and "that the court was of the opinion that if such test was made, it would develop that the witness could probably identify the test bullets presented to him by the defense." The record shows that on the morning of the day in which the motion for a mistrial was made, Judge Barwick of counsel for the defendant approached the bench and asked the judge "if they could go ahead with that

examination of the bullets, if he decided to do so," at 3:30, and that the judge assented to this suggestion. Accordingly, the court required the witness to arrange his machine for this purpose, and in doing so was justified in assuming that the privilege of cross-examination would be exercised. In the note appended by the judge, it is stated that the machine was set up at Judge Barwick's suggestion, and that at the beginning of the court at 3:30 o'clock in the afternoon the court announced that the machine was ready, and that the defendant's attorneys "could go ahead and examine the expert witness." Counsel for the defense refused to do so, for the reasons set out in the motion. This was the first notice to the court that the cross-examination would not be completed. In the meantime the witness, who resided beyond the limits of the State and at a great distance away, was being detained; and this with the acquiescence of the defendant's attorneys, if not at their implied request. A single definite statement from the defendant's counsel would have closed the incident, and would have relieved the court of the necessity of calling the matter to the attention of counsel from time to time.

"Much latitude of discretion must be allowed to the courts as to their mode of conducting business." *Hatcher* v. *State*, 18 *Ga.* 460. "The order in which a party is to introduce his evidence is to be regulated by the discretion of the court." *White* v. *Wallen*, 17 *Ga.* 106. "The practice prescribing the order in which testimony shall be introduced is for the convenience of the court, and may be modified as he deems proper for the advancement of the ends of justice." *Mitchell* v. *State*, 71 *Ga.* 128 (3 c). "Discretion in regulating and controlling the business of the court is necessarily confided to the judge; and this court should never interfere with its exercise unless it is made to appear that wrong or oppression has resulted from its abuse." *Carr* v. *State*, 76 *Ga.* 592 (2 c). "To the end that the trial should be fair and impartial and conducted in an orderly way, it is the duty of the trial judge to regulate the conduct of counsel, parties, and witnesses; provided that in so doing he does not take away any right of a party under the law." *Owens* v. *State*, 11 *Ga. App.* 419 (5) (75 S. E. 519). So, in the present case, the trial judge had a discretion as to when the cross-examination should be resumed, and under the circumstances disclosed by the record there was no abuse of such discretion in the several attempts to obtain

some decisive action from counsel for the defendant with respect to the matter. Furthermore, when the defendant's counsel finally stated that the cross-examination would not be completed, the trial judge specifically instructed the jury that they should eliminate from their minds anything regarding the colloquy between court and counsel, and try the case solely upon the evidence and the defendant's statement. In the general charge the jury were again told to "obliterate" any such matter from their "mind and consideration." In view of all the facts pertaining to this matter, the court did not err in refusing to grant a new trial because of the previous refusal to declare a mistrial.

■ One of the jurors, when put upon the voir dire, stated that he would not like to say that his mind was impartial, because from reading the newspapers he had formed opinions which would have to be "broken down" before his "mind would be impartial. However, from the witnesses that could be broken down." The court then inquired of the juror whether his mind would "yield readily to the sworn testimony in the case." The juror replied that it would. The court then, over objection of the defendant, ruled that the juror "would be qualified." Error was assigned upon this ruling. It appears from the motion for a new trial that after the twelfth juror had been accepted the defendant had not exhausted his peremptory challenges, one strike remaining. But, regardless of this fact, the court did not err in holding that the juror was competent. That a juror has formed or expressed an opinion from rumor or from newspaper reports "will not disqualify him, unless that opinion be a fixed opinion and the juror should answer that that opinion would not yield readily to the testimony, or that he could not sit as an impartial juror." *Fogarty* v. *State,* 80 *Ga.* 450 (10) (5 S. E. 782). See also *Norton* v. *State,* 137 *Ga.* 842 (74 S. E. 759); *Wilburn* v. *State,* 141 *Ga.* 510 (3) (81 S. E. 444); *Chapman* v. *State,* 148 *Ga.* 531 (3) (97 S. E. 546).

■ The defendant requested a number of charges on the degree of proof and mental conviction necessary to a conviction in cases of circumstantial evidence, and it is complained that the court erred in refusing to charge the jury as thus requested. The judge in his general charge adequately instructed the jury upon the law relating to circumstantial evidence, and there was no error in refusing the defendant's requests.

The court permitted the State to introduce in evidence the two bullets which were used by the ballistic expert in making a test before the jury. The defendant objected to the introduction of these bullets, on the ground that there was no evidence which established or tended to establish that these were the identical bullets taken from the body of the deceased; and in the motion for a new trial it is contended that the court erred in overruling this objection. There is no merit in this contention. It appears from the brief of evidence, together with a note by the trial judge, that the identity of the bullets was fully established by the evidence.

There were no other exceptions. The court did not err in refusing to grant a new trial.

*Judgment affirmed. All the Justices concur.*

Russell, C. J., concurs in the result.